**CT Corporation**

**Service of Process Transmittal**
01/13/2022
CT Log Number 540877218

TO: Melissa Gravlin
Fca US LLC
1000 CHRYSLER DR OFC OF
AUBURN HILLS, MI 48326-2766

RE: **Process Served in California**

FOR: FCA US LLC (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: Rosa Barajas, an individual // To: FCA US LLC |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Exhibit(s), Notice, Instructions, Order(s), Stipulations, Attachment(s) |
| **COURT/AGENCY:** | Los Angeles County - Superior Court - Central District, CA<br>Case # 21STCV47305 |
| **NATURE OF ACTION:** | Product Liability Litigation - Lemon Law - 2019 Jeep Compass VIN 3C4NJCBB7KT715513 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, GLENDALE, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 01/13/2022 at 09:54 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | David N. Barry<br>11845 W. Olympic Blvd.<br>Suite 1270<br>Los Angeles, CA 90064<br>(310) 684-5859 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 01/13/2022, Expected Purge Date: 01/18/2022<br><br>Image SOP<br><br>Email Notification, Lance Arnott  sopverification@wolterskluwer.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System<br>330 N BRAND BLVD<br>STE 700<br>GLENDALE, CA 91203<br>877-564-7529<br>MajorAccountTeam2@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other

 CT Corporation

**Service of Process Transmittal**
01/13/2022
CT Log Number 540877218

**TO:**  Melissa Gravlin
Fca US LLC
1000 CHRYSLER DR OFC OF
AUBURN HILLS, MI 48326-2766

**RE:**  **Process Served in California**

**FOR:**  FCA US LLC  (Domestic State: DE)

advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



Please note that the documents attached
are of poor quality and the enclosed scan is
of the best quality attainable. If you require
improved quality documents, please
contact the serving party.



# PROCESS SERVER DELIVERY DETAILS

**Date:**           Thu, Jan 13, 2022

**Server Name:**    DROP SERVICE

| Entity Served | FCA US LLC |
|---|---|
| Case Number | 21STCV47305 |
| Jurisdiction | CA |



Case 2:22-cv-00964-PA-MRW   Document 1-1   Filed 02/11/22   Page 5 of 79   Page ID #:16
Electronically FILED by Superior Court of California, County of Los Angeles on 12/28/2021 05:25 PM Sherri R. Carter, Executive Officer/Clerk of Court, by D. Williams,Deputy Clerk
21STCV47305

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
FCA US, LLC, A Delaware Limited Liability Company; and DOES 1
through 20, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

ROSA BARAJAS, an individual,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es)* Stanley Mosk Courthouse | CASE NUMBER:<br>*(Número del Caso)*<br>21STCV47305 |

111 N. Hill Street
Los Angeles, CA 90012

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David N. Barry, Esq. 11845 W. Olympic Blvd., Suite 1270, Los Angeles, CA 90064  (310) 684-5859

| DATE:<br>*(Fecha)* 12/28/2021 | Clerk, by<br>*(Secretario)* | Sherri R. Carter Executive Officer / Clerk of Court<br>D. Williams | , Deputy<br>*(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☑ on behalf of *(specify):*  FCA US, LLC

under: ☐ CCP 416.10 (corporation)            ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
       ☐ other *(specify):*
4. ☑ by personal delivery on *(date):* 01/13/22

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |

Electronically FILED by Superior Court of California, County of Los Angeles on 12/28/2021 05:25 PM Sherri R. Carter, Executive Officer/Clerk of Court, by D. Williams,Deputy Clerk
21STCV47305
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Teresa Beaudet

1  DAVID N. BARRY, ESQ. (SBN 219230)
   THE BARRY LAW FIRM
2  11845 W. Olympic Blvd., Suite 1270
   Los Angeles, CA 90064
3  Telephone: 310.684.5859
   Facsimile: 310.862.4539
4
   Attorneys for Plaintiff, ROSA BARAJAS
5

6

7

8            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9      **FOR THE COUNTY OF LOS ANGELES – STANLEY MOSK COURTHOUSE**

10

| | |
|---|---|
| ROSA BARAJAS, an individual, | Case No. 21STCV47305 |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| v. | |
| FCA US, LLC, A Delaware Limited Liability Company; and DOES 1 through 20, inclusive, | |
| Defendants. | *Assigned for all purposes to the Hon. in Dept.* |

11
12
13
14
15
16
17
18
19
20

21
22     1. Breach of Implied Warranty of Merchantability under the Song-Beverly Consumer
23        Warranty Act.
24     2. Breach of Express Warranty under the Song-Beverly Consumer Warranty Act.
25     3. Fraudulent Inducement – Concealment.

       JURY TRIAL DEMANDED.
26
27
28

                                    -1-
                        **COMPLAINT FOR DAMAGES**

PLAINTIFF ROSA BARAJAS, an individual, hereby alleges and complains as follows:

## GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

1. Defendant FCA US LLC is a limited liability company doing business in the County of Los Angeles, State of California, and, at all times relevant herein, was/is engaged in the manufacture, sale, distribution, and/or importing of Jeep motor vehicles and related equipment.

2. The true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants, Does 1 through 20, inclusive, are unknown to Plaintiff who therefore sues these Defendants by such fictitious names. Plaintiff will seek leave to amend this Complaint to set forth the true names and capacities when Plaintiff has ascertained them. Further, Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein as a "Doe" is responsible in some manner for the events and happenings herein referred to and caused injury and damage to Plaintiff as herein alleged.

3. FCA US LLC and Defendants, Does 1 through 20, inclusive, are collectively hereinafter referred to as "Defendants."

4. Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, Defendants, and each of them, were the agents, servants, and/or employees of each of their Co-Defendants. Plaintiff is informed and believes, and thereon alleges, that in doing the things hereinafter alleged Defendants, and each of them, were acting in the course and scope of their employment as such agents, servants, and/or employees, and with the permission, consent, knowledge, and/or ratification of their Co-Defendants, principals, and/or employers.

5. On April 25, 2019, Plaintiff leased a new 2019 Jeep Compass, VIN 3C4NJCBB7KT715513 (hereinafter referred to as the "Vehicle"), for personal, family, and/or household purposes. The Vehicle was leased new with only thirty-one (31) existing miles for a total consideration over the term of the Lease Agreement ("Agreement") of $28,497.46. A copy of the Agreement is attached as Exhibit "1" to this Complaint.

6. The Vehicle was/is a "new motor vehicle" under the Song-Beverly Consumer Warranty Act.

7. Along with the lease of the Vehicle, Plaintiff received written warranties and other express and implied warranties including, but not limited to, warranties from Defendants that the Vehicle and its components would be free from all defects in material and workmanship; that the Vehicle would pass without objection in the trade under the Agreement description; that the Vehicle would be fit for the ordinary purposes for which it was intended; that the Vehicle would conform to the promises and affirmations of fact made; that Defendants would perform any repairs, alignments, adjustments, and/or replacements of any parts necessary to ensure that the Vehicle was free from any defects in material and workmanship.

8. Defendants provide all Jeep customers, including Plaintiff, with a Jeep Limited Warranty with the purchase or lease of a Jeep vehicle. Jeep Vehicle Limited Warranty for the Vehicle, as well as a Powertrain warranty, includes in relevant part[1]:

> **"Basic Limited Warranty Coverage:**
> The Basic Limited Warranty lasts for 36 months from the date it begins or for 36,000 miles on the odometer, whichever occurs first.
> **What Is Covered:**
> The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation. There is no list of covered parts since the only exception are tires and Unwired headphones.
> **Warranty Repairs:**
> You pay nothing for these repairs. These warranty repairs or adjustments — including all parts and labor connected with them — will be made by an authorized dealer at no charge, using new or remanufactured parts.
> **Powertrain Limited Warranty Coverage:**
> The Powertrain Limited Warranty lasts for up to five years or 60,000 miles on the odometer, whichever occurs first.
> **What Is Covered in the Powertrain Limited Warranty:**
> **Gasoline Engine**: Cylinder block and all internal parts; cylinder head assemblies; timing case, timing chain, timing belt, gears and sprockets; vibration damper; oil pump; water pump and housing; intake and exhaust manifolds; flywheel with starter ring gear; core plugs; valve covers; oil pan; turbocharger housing and internal parts; turbocharger wastegate actuator; supercharger; serpentine belt tensioner; seals and gaskets for

---

[1] https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2019/Wrangler/10393.pdf (last accessed December 20, 2021)

**COMPLAINT FOR DAMAGES**

listed components only; **Transmission**: Transmission case and all internal parts; torque converter; drive/flex plate; transmission range switch; speed sensors; pressure sensors; transmission control module; bell housing; oil pan; seals and gaskets for listed components only; **Rear Wheel Drive**: Rear axle housing and all internal parts; axle shafts; axle shaft bearings; drive shaft assemblies; drive shaft center bearings; universal joints and yokes; seals and gaskets for listed components only.

**Towing Costs Are Covered:**

The Roadside Assistance covers the cost of towing your vehicle to the nearest authorized Chrysler, Dodge, Jeep or Ram dealer if your vehicle cannot be driven because a covered part has failed."

9.     Plaintiff has duly performed all the conditions on Plaintiff's part under the Agreement and under the express and implied warranties given to Plaintiff, except insofar as the acts and/or omissions of the Defendants, and each of them, as alleged herein, prevented and/or excused such performance.

10.     Plaintiff has delivered the Vehicle to the Defendants' authorized service and repair facilities, agents and/or dealers, on numerous occasions resulting in the Vehicle being out of service by reason of repair of nonconformities. Records, repair orders and invoices of Plaintiff's presentations of the Vehicle for repair are in the possession of Defendants.

11.     Each time Plaintiff delivered the nonconforming Vehicle to Defendants' authorized service and repair facility, Plaintiff notified Defendants, and each of them, of the defects, malfunctions, misadjustments, and/or nonconformities existent with the Vehicle and demanded that Defendants or its representatives repair, adjust, and/or replace any necessary parts to conform the Vehicle to the applicable warranties.

12.     Each time Plaintiff delivered the nonconforming Vehicle to Defendants' authorized service and repair facility, Defendants, and each of them, represented to Plaintiff that they could and would conform the Vehicle to the applicable warranties, that in fact they did conform the Vehicle to said warranties, and that all the defects, malfunctions, misadjustments, and/or nonconformities had been repaired; however, Defendants or its representatives failed to conform the Vehicle to the applicable warranties because said defects, malfunctions, misadjustments, and/or nonconformities continue to exist even after a reasonable number of attempts to repair was given.

13.     The amount in controversy exceeds TWENTY-FIVE THOUSAND DOLLARS ($25,000.00), exclusive of interest and costs, for which Plaintiff seeks judgment against Defendants, together with equitable relief. In addition, Plaintiff seeks damages from Defendants, and each of them, for incidental, consequential, exemplary, and actual damages including interest, costs, and actual attorneys' fees.

## NATURE OF THE CASE

14.     The first priority of an auto manufacturer should be to ensure that its vehicles are safe and operate as intended to prevent or minimize the threat of death or serious bodily harm. In addition, an auto manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely, and its mechanical systems work properly. Moreover, an auto manufacturer that is aware of dangerous defects that cause its vehicles to consume excessive amounts of oil causing unanticipated engine stalling must promptly disclose and remedy such defects.

15.     This action arises from Defendants' failure, despite its longstanding knowledge of a material manufacturing defect, to disclose to its consumers, including Plaintiff, that 2019 Jeep Compass vehicles equipped with a certain engine, including the Vehicle, are predisposed to an excessively high rate of engine oil consumption. Further exacerbating this problem, the vehicles equipped with said certain engine are also plagued by a defective oil change indicator system (the engine oil consumption defect and oil change indicator system defect are collectively referred to herein as the "Oil Consumption Defect"). The Oil Consumption Defect causes the affected vehicles, including the Vehicle, to burn off and/or consume abnormal and excessive amounts of engine oil while simultaneously failing to alert unaware drivers.

16.     The Oil Consumption Defect poses a significant safety risk to Plaintiff and passengers of the Vehicle because it prevents the engine from maintaining the proper level of engine oil that can neither be reasonably anticipated nor predicted. Further, as described in depth below, the defective oil change indicator system can cause unexpected engine stalling and engine failure while the Vehicle is in operation at any time and under any driving condition or speed. This

1   exposes Plaintiff and occupants of the Vehicle, as well as other drivers on the road, to an increased
2   risk of accident, injury, or death.

3       17.    Defendants continue to actively conceal the Oil Consumption Defect and also
4   continue to refuse to reveal that the existence of the Oil Consumption Defect diminishes the
5   intrinsic and resale value of the Vehicle and exposes the Plaintiff to the safety concerns described
6   herein.

7       18.    Defendants have been aware of the Oil Consumption Defect since at least early
8   2013. Notwithstanding its longstanding knowledge of this manufacturing defect, Defendants have
9   refused to disclose the Oil Consumption Defect's existence when the Vehicle experienced the
10  symptoms consistent with the defect, instead choosing to ignore the defect and only providing
11  band-aid repairs to mask the Oil Consumption Defect from Plaintiff.

12      19.    Despite notice and knowledge of the Oil Consumption Defect from the numerous
13  complaints it has received directly from consumers, information provided to authorized dealers via
14  Technical Service Bulletins, information received directly from Defendants' authorized dealers,
15  National Highway Traffic Safety Administration ("NHTSA") complaints, and its own internal
16  records (including durability testing and failure rates), requests from Defendants' authorized
17  dealerships for technical assistance regarding the Oil Consumption Defect and warranty costs
18  outlaid due to the Oil Consumption Defect, Defendants have not recalled the effected vehicles to
19  repair the Oil Consumption Defect, offered its customers, including Plaintiff, a suitable repair or
20  replacement free of charge.

21      20.    Plaintiff is informed and believes, and on that basis alleges, that as the number of
22  complaints increased, and consumers grew dissatisfied with the Oil Consumption Defect,
23  Defendants were forced to acknowledge that certain model vehicles designed, manufactured and
24  sold by Defendants, including the Vehicle, suffer from an inherent defect. Instead of providing an
25  adequate repair for the Oil Consumption Defect, however, Defendants have simply attempted to
26  mask the Oil Consumption Defect without providing a solution that addresses the defect.

27      21.    As a result of Defendants' unfair, deceptive and/or fraudulent business practices,
28  Plaintiff has suffered an ascertainable loss of money and/or property and/or loss in value. The

1  unfair and deceptive trade practices committed by Defendants were conducted in a manner giving
2  rise to substantial aggravating circumstances.

3      22.     Had Plaintiff known about the Oil Consumption Defect prior to or at the time of
4  lease, Plaintiff would not have leased the Vehicle or would have paid substantially less for it.

5      23.     As a result of the Oil Consumption Defect and the monetary costs associated with
6  attempting to repair such a defect and purchasing additional engine oil, Plaintiff has suffered injury
7  in fact, incurred damages, and have otherwise been harmed by Defendants' conduct.

8      24.     As a direct result of Defendants' wrongful conduct, Plaintiff has been harmed and is
9  entitled to actual damages, including damages for the benefit of the bargain Plaintiff struck when
10 purchasing the Vehicle, the diminished value of the Vehicle, statutory damages, attorneys' fees,
11 costs, restitution, punitive damages and injunctive and declaratory relief.

12     25.     Accordingly, Plaintiff brings this action to redress Defendants' violations of the
13 Song-Beverly Act and also seek recovery for Defendants' breach of express warranty, breach of
14 implied warranty, unjust enrichment and fraudulent concealment.

15                    **NATURE OF THE OIL CONSUMPTION DEFECT**

16     26.     Motor oil acts as a lubricant and is designed to reduce friction and wear on an
17 engine's moving parts. With sufficient oil, the engine should operate properly and avoid
18 unanticipated engine stalling and/or failure, premature wear of internal moving parts and improper
19 and inefficient performance.  While changing oil periodically is necessary because the oil thickens
20 and gets dirty over time, significant amounts of oil are not burned or consumed in a properly
21 functioning engine.

22     27.     In fact, if an engine is improperly burning excessive oil, it will run rough because
23 engines are not designed for oil to fully combust in its cylinders.  Excessive oil consumption can
24 also result in fouled spark plugs and the degradation of the catalytic converter system which results
25 in an increase in dangerous emission pollutants at levels that exceed the intended state and federal
26 emissions standards.

27     28.     Defendants designed, manufactured, distributed, marketed, sold, and leased 2019
28 Jeep Compass vehicles, including the Vehicle, equipped with a 2.4 liter engine named the

-7-
**COMPLAINT FOR DAMAGES**

1  "Tigershark MultiAir II" ("2.4L Tigershark"). The 2.4L Tigershark is a single overhead cam
2  ("SOHC") inline 4-cylinder gasoline engine that uses MultiAir II variable valve timing and
3  variable valve lift technology.

4        29.    Upon information and belief, Defendants developed the "MultiAir" technology in
5  an effort to control the flow of air during the engine combustion cycle in a more effective and
6  efficient manner as when compared to mechanical variable valve timing systems. According to
7  Defendants, the MultiAir technology is supposed to increase engine power and torque, reduce fuel
8  consumption, and reduce emissions.[2] Based on information and belief, the 2.4L Tigershark requires
9  strict maintenance of oil volume to function properly.

10        30.    According to the owner's manual for the Vehicle, a computerized diagnostic system
11  identifies and measures the "health" of the oil and notifies the driver when it is time for an oil
12  change.  According to Defedants, the automatic oil change indicator system should notify the
13  driver that an oil change is required sometime between 5,500-10,000 miles depending on driving
14  conditions.[3]

15        31.    In other words, a reasonable consumer driving under normal (as opposed to severe)
16  driving conditions is instructed to change their oil either when prompted to do so by the automatic
17  oil change indicator system or by 10,000 miles.

18        32.    Despite Defendants' marketing, however, vehicles equipped with the 2.4L
19  Tigershark, including the Vehicle, suffer from a defect that results in inordinate and excessive oil
20  consumption during normal driving conditions. In fact, Plaintiff has experienced the Vehicle
21  burning off as much as one quart or more of oil per 1,000 miles.

22        33.    Vehicles equipped with the 2.4L Tigershark, including the Vehicle, hold up to 5.5
23  quarts of oil. That means if an engine consumes one quart of oil per 1,000 miles it can completely
24  run out of oil before an oil change is recommended.  The result is drivers, including Plaintiff,
25  discover they are regularly and consistently low on (or even out of) oil and must unreasonably and
26  incessantly add oil to the vehicles.

27
28
---
[2] https://media.stellantisnorthamerica.com/newsrelease.do?id=11858&mid=&searchresult (last accessed December 21, 2021)
[3] https://cdn.dealereprocess.org/cdn/servicemanuals/jeep/2018-compass.pdf (last accessed December 21, 2021)

**COMPLAINT FOR DAMAGES**

34.     Upon information and belief, the defect is caused by one or more problems related the oil escaping past the cylindar walls and piston rings resulting in oil entering the combustion chamber. Once in the cumbustion chamber, the oil is burned off thereby reducing the overall amount of oil in the engine.

35.     Exacerbating the defect causing the 2.4L Tigershark to excessively burn oil, Defendants low oil detection system is also defective. Defendants equip their vehicles, including the Vehicle, with an oil change indicator system designed to take into account different driving conditions (e.g., typical trip length, engine driving temperatures, etc.) to determine and alert the driver when the oil needs to be added or changed.

36.     Separate and apart from the oil change inidcator system, Defendants equip its vehicles, including the Vehicle, with a safety feature designed to completely and automtically shut the engine down in the event that oil pressure reaches dangerously low levels.  Defendants installed this feature in an attempt to avoid catastrophic engine failure.

37.     Remarkably, though, Defendants' oil change indicator system does not take into account actual oil levels but, rather, only works on predicted oil levels based on driving conditions. That means the oil change inidicator does not alert driver of the vehicles to low oil levels or oil loss, even when oil levels are critically, dangerously low.  This creates an extremely dangerous situation because vehicles equipped with the 2.4L Tigershark regularly experience such severe shortages of oil that the vehicles automatically shut down to protect the engine before Defendants' indicator system tells them they are critically low on oil.  This defect poses a significant safety hazard for Plaintiff as it can cause the Vehicle to stall or shut down without notice while in operation. This occurs because the engine will shut itself off when it detects a low oil condition to prevent the engine from destorying itself. Stalling most often occurs when the Vehicle is turning, accelerating, or decelerating, because during these maneuvers the oil sloshes to one side of the oil sump. Stalling during these maneuvers can be particularly dangerous because it means the vehicle can stall while turning at an instersection, or entering or exiting a highway, as example.

38.     Plaintiff further incurs considerable expenses in the form of increased maintenance costs from continually having to add oil to the Vehicle. Even while the Vehicle is still under warranty, oil changes and engine oil are typically not covered so Plaintff must pay out of pocket.

39.     Defendants through its authorized dealerships and service centers, have failed to remedy the defect. Defendants' repairs typically consist of simply topping off or changing the oil which does not fix the problem. The only known fix is a full engine replacement which is extremly costly if Plaintff is out of warranty and which Defendants often refuses to perfom if the car is still under warranty or lease. Furthermore, even if an engine was replaced, there is no idication the replacement 2.4L Tigershark engines are not susceptible to the same defect.

40.     Until the defect is fixed by Defendants, Plaintiff will continue to be at risk of dangerous engine stalling, engine damage, adding oil and frequent dealership vists will continue to be an ongoing expense and inconvenience.

41.     The Oil Consumption Defect thus continues to pose a saftety hazard and continues to impact the core functionality and value of the Vehicle.

## **PLAINTIFF'S EXPERIENCE**

42.     On or about April 25, 2019, Plaintiff visited Los Angeles Chrysler Dodge Jeep Ram in Los Angeles, California in hopes of purchasing a new Jeep Compass vehicle.  Plaintiff walked the dealership in search of a vehicle to meet Plaintiff's needs, assisted by a salesperson. Plaintiff leased, for personal, family, and/or household purposes, the Vehicle, from Los Angeles Chrysler Dodge Jeep Ram.

43.     Prior to leasing the Vehicle, Plaintiff reviewed marketing brochures, viewed television commercials touting the quality, durability and performance of Jeep vehicles and in particular, the Compass.  As described in greater detail below, the product brochure for the Vehicle stated in great detail the vehicle's numerous styling attributes, durability, fuel efficiency and impressive performance.  The salesperson also reiterated many of the same attributes and benefits of the Vehicle.

44.     Plaintiff relied on Defendants' reputation as an established and experienced auto manufacturer. Plaintiff further relied on the statements made during the sales process by

1    Defendants' agents as well as the marketing brochures produced by Defendants. More important

2    than the incomplete information Defendants made available to Plaintiff, though, was what

3    Defendants intentionally concealed from Plaintiff. At no time was Plaintiff told or made aware,

4    either publicly or privately, that the Vehicle was equipped with the Oil Consumption Defect, or the

5    problems associated therewith. These omissions were material to Plaintiff's decision to lease the

6    Vehicle. Had Defendants and/or its authorized agents publicly or privately disclosed the Oil

7    Consumption Defect before Plaintiff leased the Vehicle, Plaintiff would have been aware of such

8    disclosures, and would not have leased the Vehicle.

9         45.    Beginning on August 5, 2019, Plaintiff presented the Vehicle to Defendants for

10   repairs related to numerous defects, malfunctions, misadjustments, and/or nonconformities

11   including, but not limited to: (a) the transmission causing the Vehicle to hesitate and jerk when

12   shifting gears on two (2) separate occasions; (b) inoperative auto stop/start functionality; (c) the

13   illumination of the "Auto Stop/Start" warning message on four (4) separate occasions, resulting in

14   the replacement of the battery on three (3) separate occasions; (d) whistling noise coming from the

15   front passenger side on two (2) separate occasions; (e) the steering wheel locking; (f) a

16   nonfunctioning USB cable; and (g) the Bluetooth failing to connect.

17        46.    Furthermore, on October 25, 2021, Plaintiff again presented the Vehicle to a repair

18   facility authorized by Defendants, informing Defendants that the Vehicle was shutting off when

19   coming to a stop causing the illumination of the "Check Engine" warning light. Defendants'

20   authorized technician inspected the Vehicle and found that the oil level was below the safety mark,

21   resulting in performing a lube, oil, and filter service. After being in custody of Defendants for four

22   (4) days, the Vehicle was returned to Plaintiff and Defendants' authorized service technician

23   represented to Plaintiff that the Vehicle was then operating as intended and was safe to drive.

24   Plaintiff reasonably relied on this representation by the service technician at the Defendants'

25   authorized repair facility. All diagnostics/repairs were covered under Defendants' written warranty.

26        47.    Two weeks later, on November 8, 2021, Plaintiff again presented the Vehicle to a

27   repair facility authorized by Defendants, notifying Defendants that the Vehicle was again shutting

28   off and consuming excessive oil. Defendants' authorized technician resulted in performing an oil

-11-
**COMPLAINT FOR DAMAGES**

1  consumption test and recommended Plaintiff to return to recheck the oil level after 1,500 miles.

2  After being in custody of Defendants for four (4) days, the Vehicle was returned to Plaintiff and

3  Defendants' authorized service technician represented to Plaintiff that the Vehicle was then

4  operating as intended and was safe to drive.  Plaintiff reasonably relied on this representation by

5  the service technician at the Defendants' authorized repair facility. All diagnostics/repairs were

6  covered under Defendants' written warranty.

7       48.    Notwithstanding Defendants' numerous attempts to repair the Vehicle, Plaintiff to

8  this day continues to experience many of the same issues including, unsurprisingly, the issues

9  caused by the Oil Consumption Defect.

10      49.    At the time of Plaintiff's lease, Defendants knew that that the Vehicle was equipped

11  with the 2.4L Tigershark which experiences the Oil Consumption Defect. Neither Defendants nor

12  any of its agents, dealers, or representatives informed Plaintiff of the Oil Consumption Defect prior

13  to the lease of the Vehicle.  Further, Defendants nor any of its agents, dealers, or representatives

14  informed Plaintiff of the Oil Consumption Defect during any of the numerous presentations of the

15  Vehicle for repair of the Oil Consumption Defect. Plaintiff leased – then operated the Vehicle on

16  the reasonable but incorrect belief that the Vehicle would consume oil properly as warranted.

17      50.    Had Plaintiff been advised of the Oil Consumption Defect at or before the point of

18  lease, Plaintiff would not have leased the Vehicle or would have paid significantly less for the

19  Vehicle.  Plaintiff did not receive the benefit of the bargain. As a result, Plaintiff has paid and

20  continues to pay a premium for the Vehicle equipped with a known Oil Consumption Defect which

21  poses a safety hazard to Plaintiff, Plaintiff's family, and others.

22  **DEFENDANTS HAD PRIOR, EXCLUSIVE AND SUPERIOR KNOWLEDGE OF THE**

23  **OIL CONSUMPTION DEFECT AND CONCEALED THE OIL CONSUMPTION DEFECT**

24  **FROM PLAINTIFF**

25      51.    Plaintiff is informed and believes, and on that basis alleges, that Defendants knew of

26  the defects associated with the Oil Consumption Defect at least as early as 2013, and certainly well

27  before Plaintiff leased the Vehicle. Defendants had exclusive knowledge of the Oil Consumption

28  Defect and the dangers caused by it through sources such as internal repair data issued via

1    Technical Service Bulletins, complaints made to and collected by the NHTSA and directly to

2    Defendants, testing done by Defendants in response to those complaints as well as through other

3    internal sources exclusively available to Defendants prior to discovery.

4         **A.    DEFENDANTS HAD PRIOR KNOWLEDGE OF THE OIL CONSUMPTION**

5              **DEFECT**

6         52.    Defendants engage in rigorous and extensive pre-launch testing of its vehicles.[4]

7    Given that the 2.4L Tigershark was a technologically groundbreaking engine, Defendants

8    undoubtedly performed extensive testing prior to sending the vehicles to market.  Plaintiff has no

9    access to the design, engineering, and testing data without discovery, but upon information and

10   belief, analysis of this data will reveal Defendants' knowledge of the Oil Consumption Defect.

11        53.    Upon information and belief, Defendants also maintain a dedicated department to

12   monitor public websites to ensure they are aware of emerging safety-related issues. Emerging

13   problems such as the Oil Consumption Defect would invariably be monitored by Defendants and

14   relevant information would be complied and shared with Defendants' design, development, testing,

15   service and quality departments for follow up.

16        54.    Upon information and belief, Defendants' customer relations department routinely

17   monitors the internet for consumer complaints and routinely receives and responds to customer

18   calls concerning product defects.  Upon information and belief, Defendants' customer relations

19   department also collects and analyzes field data including, but not limited to, repair requests made

20   at dealerships and service centers, technical reports prepared by engineers that have reviewed

21   vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

22        55.    Defendants knew about the Oil Consumption Defect because its customer relations

23   department has received numerous reports that the Oil Consumption Defect can cause mechanical

24   breakdown and stall a moving vehicle without any warning. Dealership repair records and warranty

25   claims data also support Defendants' knowledge of the defects.

26

27   _____

28   [4] https://www.detroitnews.com/story/business/autos/chrysler/2015/07/31/fca-test-labs-can-create-blizzards/30958689/
     (last accessed December 21, 2021)

56.     Defendants are also aware of other complaints from aggrieved consumers online. For example, there is a petition with, to date, 645 e-signatures on www.change.org which states in relevant part:

> "Chrysler has a known and prevalent issue with 2017 - Current Jeep Compasses consuming oil. There have been numerous reports of vehicles shutting down without warning because they ran out of oil. Individuals have reported that this has occurred without any indication from the vehicle that there is a problem. Chrysler has not issued a recall for these engines or acknowledged that this is a major issue. The Manufacturer and the dealerships are well aware of the problem, yet neither have made an identifiable effort to inform consumers of the potential danger. I respectfully request that you help me petition for the recall of these engines to protect the lives of those who have purchased these vehicles."[5]

**(i).    Defendants Had Access To Dealership Warranty Claims Data**

57.     Upon information and belief, Defendants' authorized dealerships are required to maintain detailed records for any warranty repairs performed and provide said data on a regular basis to Defendants. Upon information and belief, Defendants regularly compile and monitor detailed warranty service information from its network of authorized dealerships regarding repairs performed under warranty.    Additionally, Defendants had knowledge of the Oil Consumption Defect from complaints made by consumers directly to Defendants.   Based on the information provided to Defendants from its authorized dealerships and directly from consumers, and based on the pervasive and incessant Oil Consumption Defect warranty repairs performed by and at Defendants' network of authorized dealerships, Defendants would have had knowledge of the Oil Consumption Defect no later than 2013.

**(ii).    Defendants Issued Technical Service Bulletins Regarding the Oil Consumption Defect**

58.     Technical Service Bulletins, or TSBs, document recommended procedures for repairing vehicles, issued by a vehicle manufacturer when there are several occurrences of an

---

[5] https://www.change.org/p/fca-us-chrysler-group-make-jeep-acknowledge and recall engines with oil consumption-issues (last accessed December 21, 2021)

**COMPLAINT FOR DAMAGES**

1    unanticipated problem.  Sometimes called "secret warranties," TSBs cover known problems and

2    provide repair instructions for service technicians and accordingly are distributed to all of the

3    manufacturer's   dealerships.   These   communications   standardize   service   throughout   a

4    manufacturer's agent dealership network, and explicitly are not meant for consumer review. Often,

5    TSBs do not reveal the root cause of a problem but, rather, only describe a complaint and a

6    remedy.  The language used in TSBs is frequently in terms that a lay person would not understand,

7    and do not disclose the severity or scope across all the vehicles effected by the issue.

8         59.    Upon information and belief, Defendants issued numerous TSBs to its dealerships

9    and authorized service centers describing the Oil Consumption Defect and informing service

10   technicians of the temporary "fix" suggested by Defendants.

11        60.    On July 31, 2015, Defendants issued TSB 09-007-15 providing guidance on what

12   was an "acceptable rate of oil consumption" for all 2013-2016 vehicles equipped with gasoline

13   engines, stating in relevant part:

14            "The accepted rate of oil consumption for engines used in
             the vehicles listed above is 1 quart (0.946 liter) in 2,000
15           miles (3,200 km) for the 1st 50,000 miles (80,467 km). For
             vehicles with more then [sic] 50,000 miles the acceptable
16           oil consumption for engines is 1 quart (0.946 liter) in 750
             miles (1,207 km)."
17

18        61.    These guidelines, however, are entirely inconsistent with Defendants' Owner's

19   Manual, as discussed above, and represent Defendants attempt to "normalize" the excessive oil

20   consumption of the effected vehicles, including the Vehicle. More importantly, TSB 09-007-15

21   demonstrates that Defendants were aware in 2015 that consumers were contacting Defendants and

22   dealers with oil consumption issues necessitating the issuance of the TSB to address them. They

23   also demonstrate that at minimum, Defendants were on notice at least as early as July 2015 that

24   problems arising from excessive oil consumption were occurring in vehicles equipped with the

25   2.4L Tigershark.

26        62.    On May 16, 2020, Defendants issued TSB 09-006-20 regarding the Oil

27   Consumption Defect in the 2018 Jeep Compass vehicles equipped with the 2.4L Tigershark .[6]

28   _____
     [6] https://static.nhtsa.gov/odi/tsbs/2020/MC-10176578-9999.pdf (last accessed December 21, 2021)

**COMPLAINT FOR DAMAGES**

63.     According to TSB 09-005-20 the 2.4L Tigershark required a test that is used to determine the source of excessive internal oil consumption. Amongst other things TSB 09-006-20 advises technicians to: (a) ensure the test vehicle has a minimum of 2400 km (1500 miles) until the next oil change is required, if the vehicle does not have 1500 miles wait until the scheduled oil change to start the test; (b) check the oil level at least 5 minutes after a hot shutdown with the vehicle on a level surface; (c) ensure the oil level is at the "FULL" mark on the dipstick. (d) Tamper proof the oil pan drain plug, oil filter, dipstick, and oil fill cap with a black lighmarking device, paint pen or touch-up paint; (e) record the vehicle mileage. (Note the oil level is at the 'full' mark 5 minutes after hot shutdown and date); (f) instruct the customer to drive the vehicle as usual. The technician was then instructed to require that the customer bring the vehicle back to Defendants authorized service center for assessment of the excessive oil consumption after 1,500 - 1,700 miles.

64.     Defendants also issued TSBs 09-005-20 and TSB 09-006-20 REV. A and B in 2020. Both TSBs again acknowledge and recognize the incessant complaints regarding the Oil Consumption Defect and both TSBs again provide no real solution to the problem other than to place the responsibility on the consumer to continue to check and add oil as needed.[7]

65.     While Defendants provided a variety of suggested fixes, the root problem of the Oil Consumption Defect has never been identified and the dangerous issues caused by the Oil Consumption Defect persist to this day, including the problems the Plaintiff has experienced with the Vehicle. The continued issuance of the numerous TSBs show that Defendants knew there were significant and ongoing problems with the Oil Consumption Defect the root cause of which could not be identified or properly remedied in a proper, safe and/or permanent manner.

**(iii).    *Defendants Were Aware of Consumer Complaints Made Through The National Highway Traffic Safety Administration***

66.     NHTSA includes a department called the Office of Defects Investigation ("ODI"). The NHTSA ODI provides a system for motor vehicle owners to report complaints relating to

---

[7] https://static.nhtsa.gov/odi/tsbs/2020/MC-10176586-9999.pdf (last accessed December 21, 2021); https://static.nhtsa.gov/odi/tsbs/2020/MC-10178677-9999.pdf (last accessed December 21, 2021).

**COMPLAINT FOR DAMAGES**

safety defects that pose a risk of accidents, injuries, and even death in vehicles manufactured or imported in the United States. The safety defect complaints are entered into NHTSA ODI's consumer complaint automated database, which manufacturers can access. NHTSA ODI also provides these consumer complaints to the vehicle's manufacturer, including Defendants. Defendants undoubtedly review NHTSA ODI consumer complaints. Given that the vast majority of vehicle owners are not aware of NHTSA ODI and/or its reporting system, complaints received by NHTSA ODI are a small minority of the overall number of complaints made to Defendants, which also receives complaints directly and/or through its authorized dealerships.

67.     Since at least September 2013, consumers have submitted NHTSA ODI complaints regarding the Oil Consumption Defect experienced by Plaintiff and described in the TSBs issued by Defendants. The number and content of NHSTA ODI consumer complaints highlight the systemic and yet to be addressed defects in the Oil Consumption Defect.

68.     By way of example, complaints lodged with the NHTSA ODI include the following (note that spelling and grammar mistakes remain as found in the original):[8]

**NHTSA ID Number: 10545374**
**Complaint Date: September 25, 2013**

**Summary of Complaint**
WAS GOING TO PICK UP MY BOYFRIEND AND WHEN 3 MILES FROM HOME OIL PRESSURE LIGHT CAME ON. I WAS ON A MAJOR HIGHWAY AND WAS TRYING TO GET TO A SAFE PULL OFF SPOT WHEN THE CAR DIED IN THE MIDDLE OF THE HIGHWAY .(THIS SECTION OF HIGHWAY WAS AN AREA OF MAJOR SEMI-TRUCK TRAFFIC) ALL THE OIL HAD DRAINED OUT OF THE VEHICLE AND HAD TO HAVE THE CAR TOWED TO DEALERSHIP.

**NHTSA ID Number: 10725408**
**Complaint Date: June 15, 2015**

**Summary of Complaint**
ON 12/19/14 WHILE DRIVING, MY VEH STALLED WITHOUT WARNING. THERE WAS NO WARNING LIGHTS ILLUMINATED BEFORE, DURING/AFTER ITS FAILURE. I HAD TO HAVE THE CAR TOWED. AFTER INSPECTION, I WAS TOLD THAT THE ENGINE OF MY NEW JEEP WAS BURNING OIL. THE JEEP RECENTLY HAD BEEN IN FOR AN OIL CHANGE & RTD WITH THE MULTI POINT INSPECTION PAPERWORK INDICATING

---

[8] http://www-odi.nhtsa.dot.gov/complaints/ (last accessed December 21, 2021)

EVERYTHING WAS OK.  HERB CHAMBERS, ALTHOUGH DIAGNOSISING THE JEEP TO
BE "BURNING OIL" INSISTED, AT THE DIRECTION OF CHRYSLER PROTOCOL, THAT I
DRIVE IT 5,000 MILES AND RETURN IT FOR FURTHER INSPECT.  ONLY AFTER MY
HUSBAND GOT INVOLVED DID THEY KEEP THE CAR, DRIVE IT, AND EVENTUALLY
INSTALL A NEW ENGINE. ON 5/6/2015 THE JEEP LOST POWER DESCENDING A HILL.
THE CHECK TRANSMISSION LIGHT ILLUMINATED.  THE VEHICLE WAS RETURNED
HOME & DRIVEN TO HERB CHAMBER. AFTER INSPT THE JEEP NOW NEEDED A NEW
TRANSMISSION.  ACCORDING TO JEEP, THE TRANSMISSION HAS AN INTERNAL
LEAK.  AGAIN, 3 WKS EARLIER, THE CAR WAS AT THE DEALERSHIP FOR TIRE
ROTATION AND OIL CHANGE.  THE MULIT POINT INSPECTION, INDICATED ALL
FLUIDS, INCD THE TRANS FLUID WAS OK.  WHILE THE JEEP WAS BEING FIXED, I
ALSO EXPRESSED CONCERN OVER RUBBING NOISE WHEN TURNING.  NEW
BUSHINGS WERE PLACED INTO THE JEEP.  WE HAVE SENT EMAILS & MADE PHONE
CALLS TO CHRYSLER AND HAVE NOT HEARD BACK.  WE ARE DRIVING A NEW VEH
THAT HAS PROVEN UNSAFE AND UNRELIABLE W/O ANY REMEDY FROM THE
MFGR. I WOULD LIKE OTHER JEEP OWNERS TO BE AWARE OF THE REOCCURRING
PROBS WITH THIS JEEP.  I BELIEVE THE RELEASE OF THE JEEP WAS DELAYED DUE
TO TRANSMISSION PROBLEMS & THAT POSSIBLY IS/WAS A RECALL (OF WHICH WE
WERE NEVER NOTIFIED). I ALSO BELIEVE THE AXEL/BUSHINGS IS A RECALL
(AGAIN ONE WE WERE NEVER NOTIFIED OF) NOR WOULD IT HAVE BEEN REPAIRED
IF WE DID NOT REQUEST IT BE CHECKED.  CHRYSLER HAS NOT MADE ANY EFFORT
TO REMEDY THIS SITUATION. ON ALL OCCASSIONS, WE THE CONSUMER, HAD TO
REACH OUT TO THEM.


**NHTSA ID Number: 10730664**
**Complaint Date: June 26, 2015**

**Summary of Complaint**
CAR CONSUMES 1QT OF OIL EVERY 1000 MILES. THE VALVETRAIN IS HYDRAULIC
AND WHEN LOW THE CAR STUTTERS AND STALLS.

**NHTSA ID Number: 10790238**
**Complaint Date November 13, 2015**

**Summary of Complaint**
CAR STALLED WHILE OPERATING UNDER FULL POWER ON THE INTERSTATE.  IT
TOOK APPROX. 3 MINUTES AND IT FINALLY RESTARTED. TOOK CAR TO
DEALERSHIP.  THEY STATE CAR IS NOT PART OF ANY RECALL BASED ON VIN #.
THEY STATE STALLING WAS RESULT OF EXTREMELY LOW OIL.  HOWEVER, THE
CARE HAS NO LEAK AND DOES NOT BURN OIL.  IT IS SYNTHETIC OIL AND IT
SIMPLY BREAK DOWNS AND DISSIPATES.  I DON'T BELIEVE THEM.  THIS IS THE
SECOND TIME THIS CAR HAS DONE THIS AND THE FIRST TIME THEY RE-FLASHED
THE COMPUTER WITH A SOFTWARE PATCH TO FIX PROBLEM.

**NHTSA ID Number: 10793237**
**Complaint Date November 13, 2015**

**Summary of Complaint**

**COMPLAINT FOR DAMAGES**

2 TIMES ALREADY I HAVE HAD TO TAKE MY CAR INTO THE DEALERSHIP BECAUSE IT WOULD SHUT OFF RANDOMLY WHILE DRIVING. THIS HAS HAPPENED WHILE ON THE HIGHWAY AND ALSO WHILE ON BUSY STREETS. SO FAR I HAVE BEEN ABLE TO DRIFT TO THE SIDE OF THE ROAD, PUT THE CAR IN PARK AND THEN TURN THE CAR OFF AND BACK ON. THE CAR SPUTTERS WHEN RESTARTING AND ON MULTIPLE OCCASIONS WILL STALL AGAIN. BOTH TIMES THEY TRIED TO BLAME IT ON THE OIL CHANGE BEING OVERDUE. THE 2ND TIME I HAD TO HAVE THE CAR TOWED TO THE DEALERSHIP AND THEY STATED THERE WAS NO OIL IN THE CAR. HOW A CAR LOSES OIL IF THERE ISN'T A LEAK, I'M NOT SURE. THIS IS NOW THE THIRD TIME IT IS HAPPENING AND BASED ON THE CAR'S COMPUTER I STILL HAVE 30% TO GO BEFORE NEEDING AN OIL CHANGE AND THE CAR IS SHUTTING OFF ON ME AGAIN RANDOMLY. I WAS AT THE DEALERSHIP FOR THE 2ND TIME LESS THAN 3 MONTHS AGO. I DRIVE IN MIAMI AND HAVE BEEN LUCKY THAT MY SON WAS NOT IN THE CAR WITH ME.

**NHTSA ID Number: 10821593**
**Complaint Date January 21, 2016**

**Summary of Complaint**
MULTI-AIR 2 ENGINE CONSUMES 1QT OIL PER 1000 MILES. I WAS UNAWARE OF THIS CONSUMPTION ISSUE AND THE OIL WENT TO LOW AND ENGINE IS DESIGNED TO SHUT OFF. THIS STALLING HAS HAPPEN 3 TIMES TO AND 1 TO THE DEALERSHIP. NONE OF THE CARS WARNING INDICATORS COME ON WHEN PRESSURE IS LOW THE CAR JUST STALLS. DEALERSHIP RESOLUTION WATCH OIL LEVEL AND THERE IS FIX FOR THE CONSUMPTION OR ANY WAY FOR THE WARNING LIGHTS TO BE TRIGGERED. SO IF I FORGET TO CHECK THE OIL I AM GAMBLING WITH MY LIFE AND OTHERS ON THE ROAD IF THE CAR STALLS WHILE ON THE HIGHWAY.

**NHTSA ID Number: 10861386**
**Complaint Date April 25, 2016**

**Summary of Complaint**
AFTER LENGTHY OIL CONSUMPTION TESTS ON CAR BY THE DEALER, I WAS TOLD IT BURNS 1 QUART OF OIL EVERY 1000 MILES AND I WOULD HAVE TO ADD OIL AT THAT RATE. ALSO TOLD THIS WAS "ACCEPTABLE" BY CHRYSLER. NO LOW OIL LIGHT COMES ON, EVEN WHEN THE ENGINE TOTALLY FAILED AND I HAD TO HAVE IT TOWED TO THE DEALERSHIP. CURRENTLY HAVE 25000 MILES AFTER 2.5 YEARS OWNED.

**NHTSA ID Number: 10874749**
**Complaint Date June 17, 2016**

**Summary of Complaint**
THIS VEHICLE HAVE HAD TWO OCCASIONS OF MASTER CYLINDER BRAKE FLUID LOSS AND UNEXPLAINED TOTALL ENGINE OIL EVAPORATION WITHOUT WARNING THAT CAUSED THE LOSS OF POWER WHILE DRIVING. LUCKILY IT HAPPENED IN CITY, NOT HIGHWAY.

**COMPLAINT FOR DAMAGES**

**NHTSA ID Number: 10920591**
**Complaint Date November 1, 2016**

**Summary of Complaint**
CAR WILL STALL WHILE COMING TO A STOP OR SLOWING TO MAKE A TURN. TOOK IT IN TO THE DEALERSHIP AND WAS TOLD THAT THE OIL NEEDED TO BE CHANGED AND THAT THE ENGINE WOULD AUTOMATICALLY "SHUT OFF" IF AN OIL CHANGE IS NEEDED. PROBLEM HAS OCCURRED NUMEROUS TIMES EVEN AFTER HAVING THE OIL CHANGED REGULARLY.

**NHTSA ID Number: 10925430**
**Complaint Date November 10, 2016**

**Summary of Complaint**
WHEN SLOWING FOR A STOP SIGN THE CAR STALLED ONCE 5 DAYS AGO BUT RESTARTED AFTER SHUTTING DOWN AND IT WAS FINE. THEN YESTERDAY MORNING IT STALLED 3X BEFORE LEAVING MY DEVELOPMENT. I DROVE TO HAVE THE BATTERY CHECKED LOCALLY AND IT WAS OK. I DROVE TO THE DEALERSHIP WHO TOLD ME THE PROBLEM WAS BECAUSE THE OIL WAS LOW, THAT THESE CARS BURN A QUART OF SYNTHETIC OIL EVERY 2000 MILES AND "WHEN THE OIL RUNS LOW THEY SHUT OFF TO PROTECT THE CAR." WHAT?? AND HOW DANGEROUS. I QUESTIONED A RECALL RECENTLY RECEIVED ABOUT JEEPS STALLING WHILE DRIVING AND WAS TOLD IT WASN'T RELATED.  I'M REALLY JUST IN AWE AND DISBELIEF THAT THIS COULD BE A FEATURE THAT THE MANUFACTURER PLANNED FOR!

**NHTSA ID Number: 10939926**
**Complaint Date January 5, 2017**

**Summary of Complaint**
CAR JUST RANDOMLY SHUT OFF IN MIDDLE OF A 50 MPH HIGHWAY, ALMOST CAUSED ACCIDENT. IT DID IT A COUPLE MORE TIMES BEFORE I GOT IT LOOKED AT. DEALER SAID IT WAS SO LOW ON OIL IT SHUT OFF. BUT DEALER ALSO CONFIRMED OIL WAS NOT LOW ENOUGH TO TRIGGER THE WARNING LIGHT AND ALSO EXPLAINED IT HAS BEEN HAPPENING FREQUENTLY WITH MY MODEL.

**NHTSA ID Number: 10984771**
**Complaint Date May 10, 2017**

**Summary of Complaint**
AFTER WORK I GO TO START MY CAR AND THERE WAS A HARD START AND THEN MY CAR DIED. THE ENGINE FELT LIKE IT WAS GOING TO POP OUT OF THE HOOD. WELL, CHRYSLER WAS INFORMED AND MY CAR WAS TOWED NEXT DAY TO THE DEALERSHIP. MY SERVICE MAN CALLED APPROXIMATELY 45 MIN AFTER MY CAR WAS DELIVERED TO THEM EXPLAINING TO ME I WAS ABOUT 2 QUARTS LOW ON OIL. THIS IS IMPOSSIBLE I EXPLAINED TO HIM. ON THE DRIVER SIDE THERE IS A STICKER SHOWING I JUST GOT MY OIL CHANGE NOT TO LONG AGO. MY SERVICE MAN SAID THIS IS A KNOWN PROBLEM WITH THIS ENGINE. THIS TYPE OF ENGINE BURNS OIL AND I RECOMMEND WHEN YOU FILL UP YOUR TANK TO CHECK YOUR

OIL EVERY TIME. I FILL UP ONCE A WEEK SO I HAVE TO CHECK MY OIL ONCE A WEEK!?  THIS IS RIDICULOUS MY NEW CAR BURNS OIL!? GOOD THING THIS HAPPENED AFTER WORK. WHAT IF MY CAR WOULD HAVE STALLED WHILE DRIVING WITH MY KIDS. I DRIVE ACROSS TOWN TO TAKE AND PICK UP MY KIDS FROM SCHOOL.  NOW I HAVE TO CARRY A QUART OF OIL SO MY CAR DOESN'T STALL AND DIE ON ME.

**NHTSA ID Number: 11003740**
**Complaint Date July 7, 2017**

**Summary of Complaint**
SECOND TIME THIS HAS HAPPENED. THE ENGINE WILL STALL RANDOMLY WHILE DRIVING. THE FIRST TIME IT HAPPENED, WE HAD TO HAVE IT TOWED TO THE DEALERSHIP. THEY SAID IT WAS A SENSOR COVERED UNDER WARRANTY. OK GOOD. WELL A FEW DAYS AFTER, THE PROBLEM HAPPENED AGAIN. THIS TIME THEY SAY IT'S BECAUSE THE OIL NEEDED TO BE CHANGED. THE HUD SHOWED OVER 50% OIL LIFE LEFT. THE SAME ISSUE HAPPENED AGAIN A FEW DAYS AGO. THE PROBLEM SEEMS TO RESOLVE AFTER AN OIL CHANGE. I'VE NOTICED THIS HAS HAPPENED TO A LOT OF PEOPLE, BUT STILL NO RECALLS. THIS IS EXTREMELY DANGEROUS. WHEN THE ENGINE STALLS, YOU LOOSE POWER STEERING AND BRAKES. THIS CAN CAUSE A MAJOR ACCIDENT. LUCKILY, IT'S ONLY HAPPENED ON SURFACE STREETS. THIS ISSUE NEEDS TO BE LOOKED INTO AND FIXED.

**NHTSA ID Number: 11032827**
**Complaint Date October 11, 2017**

**Summary of Complaint**
I DON'T KNOW WHAT TO DO WITH THE VEHICLE. IT'S GIVEN ME PROBLEMS SINCE I FIRST BOUGHT IT. THE FIRST TIME I HAD A PROBLEM WITH THIS VEHICLE WAS A MONTH AFTER I PURCHASED IT FROM THE DEALERSHIP. I WAS DRIVING IT, AND IT SUDDENLY TURNED OFF AND ALL OF THE LIGHTS ON THE DASHBOARD TURNED ON. NOW IT DOES IT FREQUENTLY. THE LAST TIME WAS LITERALLY THIS 3RD OF OCTOBER.  THE DEALERSHIP MECHANICS SUPPOSEDLY SAID IT HAPPENS BECAUSE THE OIL IS LOW ON THE CAR, THAT THE CAR'S SYSTEM SHUTS OFF TO PROTECT THE VEHICLE FROM DAMAGE TO THE MOTOR, DUE TO LOW OIL. IT SEEMS RIDICULOUS THAT CHRYSLER IS WILLING TO RISK THEIR BUYERS WITH SUCH A FAULT SYSTEMS. ALL THE DEALER SAID WAS THAT IT WAS NORMAL AND NOTHING TO WORRY ABOUT. HOWEVER, WHEN THIS HAS HAPPENED TO ME IT HAS BEEN WHEN THE OIL LIFE IS AT NO LESS THAN 58%. IT IS VERY UNSAFE TO DRIVE THIS VEHICLE. I CAN CRASH AT ANY MOMENT. AND THE MOTOR JUST BURNS THROUGH OIL LIKE CRAZY. MY MECHANIC CHECKED IT AFTER MAYBE THREE WEEKS OF AN OIL CHANGE AND IT WAS COMPLETELY OUT OF OIL ALREADY. IT SEEMS LIKE.

**NHTSA ID Number: 11042070**
**Complaint Date November 1, 2017**

**Summary of Complaint**

**COMPLAINT FOR DAMAGES**

THE CAR WILL SHUT DOWN WITH ABSOLUTELY NO WARNING, DOESN'T MATTER HOW FAST YOU ARE GOING. THIS HAS HAPPENED ON BOTH HIGHWAY AND BACK STREETS. I'M TOLD BY DEALER THAT THE ISSUE IS THE OIL WAS TOO LOW AND THAT SOME SENSOR SHUTS DOWN THE ENGINE. NO WARNING LIGHT, NOTHING. JUST HAPPENS. CAN'T BELIEVE THIS FLAW HAS NOT BEEN RECALLED OR CAUSED FATALITIES. THE CAR CONSUMES OIL LIKE IT'S GOING OUT OF STYLE. I BOUGHT THE CAR USED, IN MARCH 2017 WITH 63186 MILES ON IT. I NOW HAVE JUST UNDER 74000 MILES AND HAVE HAD THE OIL CHANGED 3X AND HAVE BEEN ADDING OIL MANUALLY. I SEE A LOT OF THIS ISSUES LISTED ON WWW.CARCOMPLAINTS.COM AND OTHER SITES. I'VE BEEN TOLD BY A LOCAL DEALER THAT THE ENGINE NEEDS TO BE REPLACED, BUT SO FAR HAVE BEEN DENIED BY CHRYSLER. LAST TIME IT HAPPENED WAS LAST WEEK (10/24/17). SOMEBODY'S GOING TO GET KILLED!

**NHTSA ID Number: 11046423**
**Complaint Date November 15, 2017**

**Summary of Complaint**
WHILE DRIVING ON SUNDAY MY JEEP SUDDENLY WITHOUT NOTICE OR WARNING SHUT OFF AND WOULD NOT RESTART, I WAS STRANDED IN MIDDLE OF THE ROAD SINCE THERE WAS NO WARNING I HAD NO TIME TO PULL TO SIDE. AAA TOWED TO CLARK CHRYSLER/JEEP WHERE IT WAS BOUGHT AND UNDER EXTENDED WARRANTY. ALL PM'S HAVE BEEN DONE THERE AND DONE TIMELY. WHAT THEY FOUND WAS JEEP WAS DOWN 3 QTS OF OIL, I ASKED HOW THAT COULD BE AND WHY WOULD ENGINE SHUT OFF SO ABRUPTLY THEY CLAIM THE 2.4 ENGINES USE 1QT PER 1,000 MILES, THAT NO INDICATOR OR WARNING COMES ON AND ENGINE WILL SHUT OFF TO PROTECT IT. NO WHERE IS IT LISTED IN OWNERS MANUAL, I HAVE BEEN IN AUTOMOTIVE FOR OVER 30 YEARS AND IF AN ENGINE BURNS A QT PER 1,000 YOU REBUILD OR BUY A NEW ENGINE, I AM NOW TOLD I MUST CHECK AND ADD OIL EVERY 1,000 MILES ON A 2015 WITH ONLY 42,000 MILES! SAFETY CONCERN IS IF ANYONE IS ON HIGHWAY IT COULD CAUSE DEATH WITH A SUDDEN STOPPAGE OF VEHICLE, I WAS LEFT IN THE MIDDLE OF OF A COUNTRY ROAD AND AAA HAD POLICE COME TO HELP BLOCK ME FROM TRAFFIC PASSING AROUND ME, I NEVER HEARD OF ANYTHING LIKE THIS SO I CALLED JEEP AND MELISA ON THEIR CONSUMER LINE CONFIRMED WITH SERVICE TECH IAN HOGAN AND TOLD ME THAT SHE IS TOLD IT HAPPENS AND THERE IS NO WARNING , HOW CAN JEEP THINK THIS IS SAFE WITHOUT AT LEAST NOTIFYING OWNERS TO BE AWARE?

**NHTSA ID Number: 11051820**
**Complaint Date December 1, 2017**

**Summary of Complaint**
MY CAR HAS SHUT OFF 3 TIMES JUST THIS WEEK WHILE DRIVING. EACH TIME I WAS IDLING AT A STREET LIGHT. THE DASH SAYS TO PUT CAR BACK IN PARK AND THEN IT TAKES A COUPLE OF TRIES TO RESTART IT. TOOK IT TO THE DEALER THEY SAID I HAVE NO OIL. BUT I JUST HAD AN OIL CHANGE NOT TOO LONG AGO AND I HAVE NO LEAKS. THIS CAR IS CONSUMING WAY TOO MUCH OIL. NO WARNING LIGHT CAME ON THAT I WAS LOW ON OIL. I WAS IN A YIELDING LEFT HAND TURNING LANE WHEN THE CAR SHUT OFF 2 OF THE 3 TIMES. IF IT HAD HAPPENED

**COMPLAINT FOR DAMAGES**

A FEW SECONDS LATER I COULD HAVE BEEN T-BONED WITH MY SON IN THE CAR ON THAT SIDE. VERY DANGEROUS!!!!! THIS SHOULD BE RECALLED.

**NHTSA ID Number: 11074574**
**Complaint Date February 23, 2018**

**Summary of Complaint**
CAR IS BURNING OIL AND SHUTTING OFF ON THE ROAD, WHICH I OR MY CHILDREN, CAN EASILY GET HURT OR KILLED. HAVE TRIED TO HAVE RESOLVED NUMEROUS TIMES WITH UNSATISFACTORY RESULTS FROM THE CAR LOT. AS ADVISED FROM THE SERVICE MANAGER THIS IS NORMAL UNDER CHRYSLER STANDARDS.

**NHTSA ID Number: 11090825**
**Complaint Date May 15, 2018**

**Summary of Complaint**
WHILE DRIVING THE ENGINE CUT OUT. I DRIFTED TO THE SIDE OF THE ROAD, PUT IT IN PARK AND RESTARTED IT. THERE WASN'T ANY MESSAGE THERE WAS A PROBLEM. IT WAS FINE FOR A COUPLE OF DAYS AND THEN WHILE DRIVING TO WORK THE SAME THING HAPPEN AGAIN. I WAS ABLE TO GET TO THE SIDE WITHOUT BEING HIT. ON CHECKING THE INTERNET IT SHOWED OTHERS HAD THE SAME PROBLEM AND WAS RELATED TO OIL. . CHECKED OIL AND IT WAS LOW. I TOOK IT TO THE DEALERSHIP AND THEY CONFIRMED THE 2.4 CUTS OFF EVEN IF THE VEHICLE IS IN MOTION WITH NO WARNING WHEN OIL IS LOW. NO ONE EVER TOLD ME THIS. HAD I BEEN ON A BUSIER MULTI LANE ROAD I MAY HAVE BEEN INVOLVED IN AN ACCIDENT. I HAVE NEVER NEEDED TO CHECK MY OIL BETWEEN SERVICE ON A NEWER CAR BEFORE THIS IS AN UNSAFE DEFAULT TO LOW OIL. IT PUTS THE DRIVER AND PUBLIC IN DANGER. HAD I BEEN TOLD THE VEHICLE MAY SHUT OFF WHILE I WAS DRIVING I WOULD NEVER HAVE BOUGHT THE CAR. I CANT BELIEVE THAT THEY ARE ALLOWED TO HAVE THIS AS A FEATURE WITH NO WARNING.

**NHTSA ID Number: 11096411**
**Complaint Date May 16, 2018**

**Summary of Complaint**
THE VEHICLE SHUT OFF ON MY WIFE AND CHILD WHILE SHE WAS DRIVING IT ON THE HIGHWAY, AND WE TOOK IT TO THE DEALERSHIP AND THEY SAID IT WAS LOW ON OIL AND THEY DID AN OIL CONSUMPTION TEST AND CLEARED THE VEHICLE AND SAID IT WAS A COMMON PROBLEM AND THEY HAVE TO DO OIL CONSUMPTION TEST BEFORE CHRYSLER WILL ISSUE A REPLACEMENT MOTOR, AFTER 2 MONTHS OF THE TEST THEY CONCLUDED THAT IT WAS OK AND SAFE TO DRIVE. THE ISSUE HAPPEND AGAIN WITH MY WIFE AND CHILD IN THE CAR AND DRIVING DOWN THE ROAD, SHE MADE IT BACK HOME AND THE MOTOR WAS OUT OF OIL 3,000 MILES BEFORE HER NEXT OIL CHANGE. I GOT IT TO THE DEALER AND THEY SAID THEY HAVE TO DO THE OIL CONSUMPTION TEST PROCESS AGAIN.

**NHTSA ID Number: 11118761**

**Complaint Date August 9, 2018**

**Summary of Complaint**
WHILE DRIVING A VEHICLE WITH ONLY 4200 MILES ON IT, THE JEEP STALED WITHOUT WARNING.  JEEP RESTARTED AND WAS DRIVEN.  WHEN I CALLED THE LOCAL DEALERSHIP, I WAS INFORMED TO CHECK MY OIL LEVEL - THAT IT WOULD BE LOW AND TO REFILL.  I ASKED HOW THEY KNOW THIS AND THE DEALERSHIP'S SERVICE CENTER INFORMED ME THAT THIS IS A "KNOWN ISSUE" WITH THE 2.4 LITER ENGINE AND IS "COMMON".  I CHECKED MY OIL, SURE ENOUGH, IT WAS LOW- I WOULD SAY TWO (2) QUARTS LOW (IN A 5 QUART SYSTEM).  NO "CHECK ENGINE LIGHT", NO "SERVICE ISSUE ANNOUNCEMENT" FROM JEEP - NO WARNING AT ALL FOR A "KNOWN ISSUE".  THIS IS INEXCUSABLE!  OIL TEMP WAS NEVER ABOVE HAFT WAY, I STILL HAVE 30% ON THE OIL CHANGE METER.  I OWNED A 2014 JEEP CHEROKEE AND NEVER HAD AN ISSUE WITH A 2.4L ENGINE. CAN'T WAIT TO SEE WHAT JEEP IS GOING TO DO FOR ALL THE JEEP CHEROKEE OWNERS THAT THIS "KNOW ISSUE" IS GOING TO AFFECT.

**NHTSA ID Number: 11120966**
**Complaint Date August 20, 2018**

**Summary of Complaint**
WHILE DRIVING MY CAR, THE ENGINE SHUT OFF IN MID DRIVE, IN MOTION, IN A PARKING STRUCTURE GETTING READY TO GET ON THE FREEWAY.  I COMPLAINED TO THE DEALER AND THEY SAID IT WAS BECAUSE I NEEDED AN OIL CHANGE AND I WASN'T OVER MILEAGE BY THAT MUCH, HE SAID HE HAS HEARD THIS HAPPEN BEFORE TO A CUSTOMER.  I WAS SO TERRIFIED BECAUSE I COULD HAVE BEEN ON THE FREEWAY AND COULD HAVE GOTTEN INTO AN ACCIDENT AND INJURED AND UNTIL THIS DAY I AM VERY DISTURBED AND WORRY IF IT WILL TURN OFF WHILE DRIVING AND EVEN MORE TERRIFIED IF I AM ON THE FREEWAY!  I JUST WANT TO REPORT THIS BECAUSE THE DEALERSHIP'S RESPONSE DIDN'T SIT WELL WITH ME AND I THINK IT IS VERY VERY DANGEROUS FOR THE CAR TO TURN OFF JUST BECAUSE YOU NEED AN OIL CHANGE, IS THERE A DEFECT IN MY CAR? THANK YOU.

**NHTSA ID Number: 11124329**
**Complaint Date September 4, 2018**

**Summary of Complaint**
ENGINE OIL AND STALLING.  I WENT FOR MY 2ND OIL CHANGE 8/27/2018.  THE SERVICE TECH AND A MECHANIC LISTENED WHEN I SAID THE OIL WAS BASICALLY GONE AND MY HUSBAND HAD TO ADD 2 QUARTS.  I EVEN CHECKED ALL THE SYSTEM WARNINGS AND THERE IS NONE FOR LOW OIL.  WHEN PULLING OUT INTO AN INTERSECTION THE CAR TOTALLY SHUT OFF AT 4 DIFFERENT TIMES.  SO THE MECHANIC SAID YES THOSE 2.4 ENGINES BURN 1 QUART EACH 1000 MILES AND WHEN THE OIL IS LOW THE ENGINE WILL JUST STOP.  I ASKED ABOUT WHY THERE ARE NO WARNING LIGHTS, THE MECHANIC AGAIN SAID YES THERE IS NOT ONE.  HAVING A CAR JUST SHUT OFF IS SO DANGEROUS.  IT COULD HAVE BEEN A TERRIBLE ACCIDENT IF ANOTHER CAR WAS COMING ANY OF THOSE 4 SHUT OFFS.  ALSO MY CAR JERKS WHEN SHIFTING GEARS.  THE SERVICE TECH COMMENTED I

**COMPLAINT FOR DAMAGES**

1  NEEDED A COMPUTER UPGRADE. WHILE THERE FOR THE OIL CHANGE
   SUPPOSEDLY THE UPGRADE WAS DONE.  IT JUST JERK AGAIN THE OTHER DAY
2  WHEN THE TRANSMISSION WAS SHIFTING.  THIS CAR IS JUST A YEAR OLD - ALL OF
   THESE ISSUES ARE TERRIBLE AND DANGEROUS.
3
   **NHTSA ID Number: 11130677**
4  **Complaint Date September 21, 2018**

5  **Summary of Complaint**
6  WHEN PULLING OUT OF THE DRIVEWAY AND GOING FROM REVERSE TO DRIVE
   THE CAR STALLED IN THE MIDDLE OF THE STREET. THIS HAPPENED A FEW WEEKS
7  AGO ALSO. I CALLED THE DEALERSIP AND THEY SAID IF THE OIL IS LOW THERE IS
   A SAFETY FEATURE THAT SHUTS DOWN THE ENGINE. THIS CAR ONLY HAS 3000
8  MILES ON IT AND IS 3 MONTHS OLD. NO ENGINE LIGHT OR WARNING EVER CAME
9  ON. I CHECKED THE OIL AND IT WAS A LITTLE LOW SO I ADDED A 1/2 A QUART. IN
   READING UP ON THIS VEHICLE IT SAYS IT BURNS QUITE A BIT OF OIL. THIS IS
10 UNACCEPTABLE THAT THE CAR BURNS THIS MUCH OIL AND THAT THE CAR WILL
   SHUT DOWN IF THE OIL IS A LITTLE BIT LOW.  THIS IS MORE OF A SAFETY HAZARD
11 IF THE CAR SHUTS DOWN WHILE DRIVING?

12 **NHTSA ID Number: 11131830**
   **Complaint Date September 26, 2018**
13
14 **Summary of Complaint**
   MY NEW CAR HAS 2,800 MILES DUE FOR AN OIL CHANGE AT 5 MONTHS/5,000 MILES.
15 THE ENGINE FAILED ONCE FOR NO KNOWN CAUSE AFTER 2 WEEKS IN THE REPAIR
   SHOP. NOW MY CAR DIED WHILE IN MOTION ON BUSY ROADS AND A HIGHWAY
16 RAMP AT SPEEDS BETWEEN 15-40 MPH WITHOUT WARNING OR LIGHTS. THIS IS SLA
17 SAFETY HAZARD AS THE STEERING GOES AND CAR JUST COMES TO A STOP
   WITHOUT ANY WARNING. I HAD IT TOWED AFTER IT'S 5TH TIME IN 4 DAYS
18 STOPPING WHILE IN MOTION AND SHUTTING DOWN. JEEP TOLD ME IT'S EMPTY ON
   OIL BUT YET THE OIL LIGHT INDICATOR DOESN'T COME ON. THEY SAID IT IS A
19 KNOWN ISSUE WITHOUT A FIX FOR ALL 2014-2019 JEEP CHEROKEES. THEY ARE
   AWARE BUT ARE NOT FIXING OR ADDRESSING THE OIL CONSUMPTION WITHOUT
20 LIGHT ISSUE THAT PUTS DRIVERS IN MOTION AT RISK OF AN ACCIDENT OR
21 LOSING THEIR LIFE. IF NO WARNING IS COMING ON THAT YOUR OIL IS EMPTY
   LONG BEFORE A DIE OIL CHANGE AND MY CAR CAN JUST DIE WHILE IN MOTION
22 ALONG WITH OTHERS AS AGAIN THEY STATED IT'S A KNOWN ISSUE IS A ROAD
   HAZARD FOR ANYONE IN THESE CARS. MY CAR IS 3 MONTHS OLD AND I FEEL
23 UNSAFE DRIVING IT ON ANY ROADS FOR FEAR I WILL BE HIT BY ANOTHER DRIVER
   AS IT'S JUST LOSING POWER AND SHUTTING DOWN IN THE STREET IN MOTION.
24 JEEP CANNOT FIX THIS BUT KNOWS ABOUT IT.
25
   **NHTSA ID Number: 11144644**
26 **Complaint Date November 1, 2018**

27 **Summary of Complaint**
   MULTIPLE TIMES SINCE OWNING THIS VEHICLE THE PAST 7 MONTHS, I HAVE HAD
28 TO GET 3 OIL CHANGES AND TOP OFF THE OIL MANY TIMES IN BETWEEN, WHICH IS

-25-
**COMPLAINT FOR DAMAGES**

MUCH MORE THAN THE MANUAL STATES IS NECESSARY. THIS VEHICLE BURNS THROUGH OR LOSES OIL TOO QUICKLY, WHICH CAUSES THE VEHICLE TO TURN OFF WHILE DRIVING (IN MOTION) WHICH IS A HUGE SAFETY CONCERN. IT OFTEN TURNS OFF GOING UP OR DOWN HILL, AND AFTER OR MID TURN (WHAT LITTLE OIL IS REMAINING SHIFTS) ON CITY STREETS. MY CAR HAS TURNED OFF ITSELF IN THE MIDDLE OF TRAFFIC MORE THAN A DOZEN TIMES. SOMETIMES IT TAKES A COUPLE MINUTES BEFORE IT WILL TURN ITSELF BACK ON. LIKE MENTIONED, THIS HAS OCCURRED MORE THAN A DOZEN TIMES SINCE MAY 2018 (PURCHASED VEHICLE IN MARCH 2018). BETWEEN 10/29 AND 10/31, IT OCCURRED 9 TIMES.    IF NECESSARY, I HAVE DOCUMENTATION OF THE FREQUENCY OF SERVICE NEEDED.

**NHTSA ID Number: 11156008**
**Complaint Date December 4, 2018**

**Summary of Complaint**
I HAVE ABOUT 5500 MILES ON MY NEW COMPASS. WHILE IN DRIVE THE VEHICLE DISPLAY FLASHED OIL PRESSURE LOW FOR LESS THAN A SECOND. THEN ANY INDICATION OF THAT WARNING LIGHT IS GONE. THE ENGINE THEN SHUTS DOWN WITH NO WARNING. NO BRAKE LIGHTS WHICH MAKES THIS EXTREMELY UNSAFE FOR THE POTENTIAL OF A REAR END CRASH. I TOOK THE CAR TO THE DEALERSHIP WHO SAID THAT THE ENGINE CONSUMED 3 QUARTS OF OIL. THERE WAS NO INDICATION THAT THE CAR WAS LOW ON OIL UNTIL A SECOND BEFORE THE ENGINE STALLED AND TURNED OFF.

**NHTSA ID Number: 11163959**
**Complaint Date December 29, 2018**

**Summary of Complaint**
THE VEHICLE SHUTS OFF WHEN APPROACHING 3500 MILES.  THIS HAPPENS WHEN THE VEHICLE IS IN MOTION REGARDLESS OF SPEED RENDERING THE VEHICLE EXTREMELY DIFFICULT TO MANEUVER.  THE JEEP WAS TAKEN TO DEALER AND THE MECHANIC ADVISED THAT THIS IS A KNOWN ISSUE WITH SOME OF THE NEW JEEP CHEROKEES CONTAINING CERTAIN FIAT MOTORS.  THE VEHICLES NOW HAVE A FIAT MOTOR THAT APPARENTLY BURNS THE ENGINES OIL EVERY 3500 MILES & THE SHUT OFF IS A BUILT IN "SAFETY MECHANISM" TO PREVENT THE MOTOR FROM BURNING OUT DUE TO THE LACK OF OIL.  THIS INFORMATION WAS NOT DISCLOSED WHEN THE VEHICLE WAS PURCHASED.

**NHTSA ID Number: 11174741**
**Complaint Date: February 6, 2019**

**Summary of Complaint**
TL* THE CONTACT OWNS A 2019 JEEP COMPASS. THE CONTACT STATED THAT THE VEHICLE STALLED MORE THAN 35 TIMES WITHOUT WARNING. LESTER GLENN CHRYSLER DODGE JEEP RAM FIAT (1199 ROUTE 37 W, TOMS RIVER, NJ 08755, (732) 240-8832) WAS NOTIFIED SEVERAL TIMES, BUT HAD BEEN UNABLE TO REPLICATE AND DIAGNOSE THE FAILURE TO PROVIDE A PERMANENT REMEDY. THE DEALER INDICATED THAT THE VEHICLE'S COMPUTER MAY BE THE SOURCE OF THE FAILURE; HOWEVER, THE PART WAS ON BACK ORDER UNTIL MID MARCH OF 2019.

**COMPLAINT FOR DAMAGES**

THE VEHICLE WAS NOT REPAIRED. A LOANER VEHICLE OPTION WAS NOT PROVIDED. THE CONTACT WAS UNCERTAIN IF THE FAILURE WAS RELATED TO NHTSA CAMPAIGN NUMBERS: 18V524000 (ELECTRICAL SYSTEM), 17V670000 (ENGINE AND ENGINE COOLING), AND 16V907000 (ENGINE AND ENGINE COOLING). THE MANUFACTURER WAS NOTIFIED OF THE FAILURES AND THE CONTACT WAS WAITING ON A RESPONSE TO DETERMINE THE GUIDELINES TO REPAIR THE VEHICLE. THE FAILURE MILEAGE WAS 0.

**NHTSA ID Number: 11246057**
**Complaint Date: August 23, 2019**

**Summary of Complaint**
THIS IS MY THIRD COMPLAINT ON THIS 2019 JEEP COMPASS. WHILE DRIVING THE VEHICLE STALLS AND THE EMERGENCY BRAKE AND OTHER LIGHTS COME ON. THE VEHICLE IS UNABLE TO BE RESTARTED AND HAS TO BE TOWED. THE DEALERSHIP HAS UPDATED SOFTWARE, AND NOW HAS SAID THAT THE CAR IS LOW ON OIL EVERY THREE WEEKS AND THAT'S WHY IT STALLS IN THE MIDDLE OF TRAFFIC EXTREMELY DANGEROUS AND I HAVE A BABY ON THE WAY!. THE OIL CHANGE INDICATOR DOESN'T EVER SHOW UP AND THE MANUFACTURER JUST GIVES THE RUN AROUND.

**NHTSA ID Number: 11245744**
**Complaint Date: August 28, 2019**

**Summary of Complaint:**
2019 JEEP COMPASS. CONSUMER WRITES IN REGARDS TO VEHICLE STOPPING SUDDENLY WHILE DRIVING ON THE HIGHWAY. *LD THE CONSUMER STATED THE DEALER ADVISED THAT THE VEHICLE RAN LOW ON OIL WHICH CAUSED THE ENGINE TO SHUT OFF WITHOUT WARNING. WHEN THE VEHICLE RESTARTED THE ENGINE LIGHT ILLUMINATED.

**NHTSA ID Number: 11270970**
**Complaint Date: October 25, 2019**

**Summary of Complaint**
TL* THE CONTACT OWNS A 2019 JEEP COMPASS. WHILE DRIVING APPROXIMATELY 35 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE CONTACT PULLED OVER TO THE SIDE OF THE ROAD AND WAS ABLE TO RESTART THE VEHICLE. THE VEHICLE WAS TAKEN TO WALLY ARMOUR CHRYSLER DODGE JEEP RAM (1950 W STATE ST, ALLIANCE, OH 44601) WHERE IT WAS DETERMINED THAT THE OIL LEVEL WAS LOW, WHICH CAUSED THE VEHICLE TO STALL. THE DEALER INSTRUCTED THE CONTACT TO BRING THE VEHICLE BACK TO THEM AFTER 500 MILES FROM THE LAST OIL CHANGE FOR MONITORING AND AN OIL CONSUMPTION TEST. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 4,000. THE VIN WAS UNAVAILABLE.

**COMPLAINT FOR DAMAGES**

**NHTSA ID Number: 11394635**
**Complaint Date: February 4, 2021**

**Summary of Complaint**
THE CONTACT OWNS A 2019 JEEP COMPASS. THE CONTACT STATED WHILE DRIVING 45 MPH, THE VEHICLE STALLED. THE CONTACT RESTARTED THE VEHICLE AND THE VEHICLE WORKED AS DESIGNED. THE AUTO START/STOP WARNING INDICATOR LIGHT WAS ILLUMINATED. THE VEHICLE WAS TAKEN TO SUNCOAST CHRYSLER JEEP DODGE RAM (8755 PARK BLVD N, SEMINOLE, FL 33777, (727)393-4621) TO BE DIAGNOSED. THE CONTACT WAS INFORMED THAT THE FUEL PUMP NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED HOWEVER, THE FAILURE RECURRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE 556.

69.     Defendants are compelled by federal law (which is backed by criminal penalties) to confidentially disclose defects and related information to NHTSA regarding potential auto defects which includes field reports, customer complaints and warranty data. *See TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).* Car manufacturers, including Defendants, analyze and report safety related concerns to NHTSA and, similarly, monitor NHTSA databases for emerging and ongoing customer complaints regarding their products as part of their ongoing obligation to identify and report safety related concerns. *Id.*

70.     The above examples illustrate that consumers have been vocal in complaining to NHTSA ODI about the Oil Consumption Defect since at least 2013. Based on Defendants' requirements to monitor and report safety related concerns to NHTSA, Plaintiff is informed, believes and thereon alleges that Defendants were well aware of and monitoring the myriad of NHTSA complaints dating back to 2013, and certainly well before Plaintiff leased the Vehicle.

71.     Plaintiff is informed, believes, and thereon alleges that there are hundreds of additional NHTSA ODI complaints regarding identical problems with the Oil Consumption Defect equipped in other models manufactured by Defendants.

**B.      DEFENDANTS HAD SUPERIOR AND EXCLUSIVE KNOWLEDGE OF THE OIL CONSUMPTION DEFECT**

72.     Despite notice and knowledge of the Oil Consumption Defect from the numerous complaints it has received directly from consumers, information received from dealers, information provided to authorized repair facilities via TSBs, information received from NHTSA ODI

1  complaints, and its own internal records (including durability testing), Defendants continue to

2  conceal the truth about the Oil Consumption Defect and have never offered its customers,

3  including Plaintiff, a suitable repair or replacement free of charge.

4      73.    The information regarding the Oil Consumption Defect is exclusive to Defendants

5  because it is technical in nature and, given its position as one of the largest automobile

6  manufacturers in the world, Defendants are in a far superior position to obtain and understand the

7  ongoing issues.

8      74.    Defendants are in the business of manufacturing automobiles and technical

9  components of automobiles.  That means it is Defendants' business to know technical information

10  about its vehicles and also be aware of any and all information regarding serious recurring

11  problems about its vehicles.  As an experienced auto manufacturer, Defendants are required to

12  conduct tests (including pre-release durability tests) on components of its vehicles (including the

13  Oil Consumption Defect).

14      75.    Further, Defendants have superior knowledge of the Oil Consumption Defect

15  because it has access to information (and can interpret information) that the average, reasonable

16  consumer, like Plaintiff, does not.  Defendants' customer relations department received countless

17  complaints about the Oil Consumption Defect, received field data from consumers and authorized

18  technicians, and received technical reports from its engineers who reviewed and analyzed vehicles

19  for which warranty claims were made.  None of this information is available to an average,

20  reasonable consumer like Plaintiff, nor did Defendants publicly or privately disclose any of this

21  information to Plaintiff.  Furthermore, while it may be reasonable to expect an average consumer

22  like Plaintiff to generally research a vehicle prior to lease (which Plaintiff did), what is not

23  reasonable is to have expected him or her to have performed extensive research of TSBs and

24  NHTSA ODI complaints (or to even know what they are for that matter) to determine whether any

25  material safety concerns are being intentionally concealed from them prior to lease.

26      76.    Despite having superior and exclusive knowledge, Defendants have never disclosed

27  the Oil Consumption Defect to Plaintiff or consumers.  Instead, Defendants intentionally concealed

28  the truth about the Oil Consumption Defect by propagating the falsehood that excessive oil

1   consumption was "normal" so that Plaintiff and other consumers would be put in a false state of

2   security even though their vehicles may have been dangerously low on oil.

3         77.    Defendants have allowed Plaintiff to continue to drive the Vehicle, despite knowing

4   that Oil Consumption Defect persists and continues to pose a significant risk to Plaintiff's safety.

5         78.    Defendants have not recalled the Vehicle to repair the Oil Consumption Defect.

6   ## DEFENDANTS' MARKETING AND INTENTIONAL CONCEALMENT OF THE

7   ## OIL CONSUMPTION DEFECT

8         79.    Plaintiff is informed, believes, and thereon alleges that Defendants knowingly

9   manufactured and sold cars, including the Vehicle, equipped with the Oil Consumption Defect,

10   while willfully and intentionally concealing the true inferior quality and safety risks created by the

11   Oil Consumption Defect.

12        80.    Defendants know that the safety of their vehicles is material to consumers. A car is

13   more than just transportation: it is the primary means that consumers will use to ensure that their

14   family and friends are safe and secure when travelling on America's roads and highways.

15   Defendants spends millions of dollars every year on advertising that is specifically designed to

16   persuade consumers that their vehicles are safe and reliable. However, Defendant's advertising

17   entirely omits any mention of the safety risks posed by the Oil Consumption Defect. Given that

18   Defendants knew about all of the Oil Consumption Defect and the associated safety risks to

19   consumers and the general public and knew that these issues were material to a reasonable

20   consumer, Defendants were obligated to disclose this information.

21        81.    In the marketing brochure for the 2019 Jeep Compass, Defendants state that, "You

22   can trust Compass to put the safety and security of you and passengers first and foremost"[9]. The

23   brochure further promotes the 2.4L Tighershark as follows: "Engineered to deliver the best of both

24   worlds: a quiet and refined performance backed by the ability to power through tough terrain. A

25

26

27

28   [9] https://www.auto-brochures.com/makes/Jeep/Compass/Jeep_US%20Compass_2019.pdf (last accessed on December 21, 2021)

-30-
**COMPLAINT FOR DAMAGES**

1    clean-burning, fuel-efficient workhorse. Standard"[10] and the advanced engine technology, "helps
2    reduce emissions while improving efficiency."[11]

3        82.    Based upon the national, multimedia marketing campaign positioning Defendants as
4    a premier American auto manufacturer, other representations in Defendants' marketing materials as
5    well as the recommendations of the dealer salesperson assisting the Plaintiff, the Vehicle was
6    leased by Plaintiff.  More important than what Defendants told consumers (including Plaintiff)
7    about the Vehicle, however, is what Defendants *intentionally and knowingly concealed* about the
8    Vehicle.  Defendants and their authorized dealer sales staff and other personnel never publicly or
9    privately disclosed to Plaintiff any information about the persistent and dangerous concerns that
10   plagued the Oil Consumption Defect, including the Vehicle.  Not prior to Plaintiff's lease of the
11   Vehicle.  Not during the Plaintiff's research, test drive or sales process of the Vehicle. Not at any
12   point during the numerous times the Vehicle was presented to Defendants for repair

13       83.    These omissions were material to Plaintiff's decision to lease the Vehicle.  Plaintiff
14   is a reasonable consumer who reasonably expected the Vehicle would not suffer from the Oil
15   Consumption Defect.  Further, Plaintiff reasonably expected that Defendants would not lease the
16   Vehicle with known defects, such as the Oil Consumption Defect, and that it would disclose any
17   such defects to Plaintiff before the lease of the Vehicle.  Plaintiff did not expect Defendants to
18   conceal the Oil Consumption Defect, or to continually deny its existence.

19       84.    Had Defendants and/or their authorized agents publicly or privately disclosed the
20   issues relating to the Oil Consumption Defect before Plaintiff leased the Vehicle, Plaintiff would
21   have been aware of such disclosures, and would not have acquired the Vehicle.

22       85.    As set forth above, Defendants were well-aware of the non-conformities and defects
23   related to the Oil Consumption Defect well before Plaintiff leased the Vehicle.  Despite this
24   advance knowledge of which only Defendants could know, Defendants still introduced the Vehicle
25   into the stream of commerce, which eventually led to Plaintiff leasing the Vehicle. Plaintiff had no
26   way of knowing this information relating to the Oil Consumption Defect and Defendants and their

27

28     [10] Id.
       [11] Id.

**COMPLAINT FOR DAMAGES**

1   authorized retailers and distributors of vehicles (including the Vehicle) intentionally failed to

2   disclose this information to Plaintiff.

3         86.    Consequently, Plaintiff has not received the benefit for which Plaintiff bargained

4   when the Vehicle was leased.

5         87.    As a result of the Oil Consumption Defect, the value of the Vehicle has diminished,

6   including without limitation the resale value of the Vehicle.

7        **DEFENDANTS HAD A DUTY TO DISCLOSE THE OIL CONSUMPTION**

8                                   **DEFECT**

9         88.    Despite their exclusive knowledge of the defects, Defendants, and each of them

10   continued to sell several models, including the Vehicle, equipped with the 2.4L Tigershark which

11   suffer from the Oil Consumption Defect, knowing full well they posed dangerous safety concerns

12   and cannot be repaired.  Additionally, despite this knowledge, Defendants and each of them failed

13   to provide notice of these concerns in vehicle sales materials distributed to customers and in

14   particularly, failed to disclose or otherwise kept this vital product information from customers,

15   including Plaintiff, such that Plaintiff could have made an educated and informed decision as to

16   whether to lease the Vehicle or, whether to do business with Defendants at all.

17         89.    Prior to the date of lease, on the date of acquisition and on the date of each of the

18   repair attempts, Defendants had an opportunity to disclose the Oil Consumption Defect to Plaintiff,

19   but instead concealed from and failed to disclose to Plaintiff any of the known irreparable issues

20   with the Vehicle.

21         90.    Defendants were the only party with the exclusive knowledge of the Oil

22   Consumption Defect because that knowledge came from numerous complaints it has received

23   directly from consumers, information received from dealers, NHTSA complaints, and its own

24   internal records – including durability testing and failure rates, requests from Defendants'

25   authorized dealerships for technical assistance regarding the Oil Consumption Defect and warranty

26   costs outlaid due to the Oil Consumption Defect.  None of this information was reasonably

27   available to the public, nor did Defendants publicly or privately disclose any of the information to

28   Plaintiff.

91.     The Oil Consumption Defect and the issues it manifests are incontrovertible safety related concerns which obligates Defendants' to disclose them to all consumers.  Plaintiff had no knowledge of the Oil Consumption Defect before leasing the Vehicle. In fact, as noted above, Plaintiff reviewed Defendants' advertisements and sales brochures and not one of these items disclosed the ongoing Oil Consumption Defect. Similarly, no information related to the Oil Consumption Defect was provided by the selling dealer.   *"Generally, where one party to a transaction has sole knowledge or access to material facts and knows that such facts are not known or reasonably discoverable by the other party, **then a duty to disclose exists.**" Shapiro v. Sutherland* (1998) 64 Cal.App.4th 1534, 1544. [Double emphasis added].

92.     Defendants are in the business of manufacturing, marketing, and distributing motor vehicles to consumers like Plaintiff.  Not only is it foreseeable that consumers, including Plaintiff, would go to Defendants' authorized dealerships to lease a motor vehicle that was manufactured and distributed by Defendants, but it is Defendants' goal to increase its market share in the motor vehicle industry by promoting its brand and selling or leasing vehicles to consumers like Plaintiff. Indeed, Defendants aggressively market its products for the sole purpose of convincing consumers to go to a Jeep dealership to purchase or lease a Jeep.

93.     Sales of motor vehicles to consumers take place through Defendants' authorized dealerships, pursuant to a "Dealer Sales and Service Agreement," whereby Defendants' authorized dealerships undertake several specifically enumerated obligations for the benefit of Defendants' brand, reputation, and position in the marketplace.

94.     Specifically, Defendants' authorized dealerships have a duty under the "Dealer Sales and Service Agreement" to promote and sell vehicles manufactured and distributed by Defendants in a manner that is consistent with the standards set and controlled by Defendants. Under this agreement Defendants' authorized dealerships are responsible for effectively selling, servicing, and otherwise representing Defendants' vehicles and related products in the dealership's geographic area. Under this agreement Defendants' authorized dealerships are obligated to maintain a staff of trained sales personnel, using training and materials produced, maintained, controlled and made available by Defendants.

95.     Similarly, Defendants also have obligations under the aforementioned "Dealer Sales and Service Agreement" to conduct general advertising programs to promote the sale of Defendants' vehicles and related products for the mutual benefit of Defendants and their authorized dealerships.  In addition, Defendants are obligated to make available to their authorized dealerships advertising and sales promotion materials.  Further, Defendants are obligated to provide training to the sales personnel at Defendants' authorized dealerships with regard to the sale of Defendants' motor vehicles.

96.     One of the marketing products that Defendants provide to their authorized dealership is the marketing brochure for each year, make, and model of vehicle sold by Defendants' authorized dealerships, including the marketing brochure for the Vehicle.  These marketing brochures are made available to consumers who visit Defendants' authorized dealerships and are routinely used during the sales process.  Whether or not a physical brochure is presented to a potential purchaser, the sales personnel at Defendants' authorized dealerships are trained to be familiar with the messages contained within those brochures and these messages are conveyed throughout the sales process by the sales personnel at Defendants' authorized dealerships.

97.     Plaintiff is informed, believes, and thereon alleges that Defendants also derived a monetary benefit from sale of the Vehicle either directly by Los Angeles Dodge Jeep Ram remitting a portion of the lease to Defendants, by Los Angeles Dodge Jeep Ram having to order an additional 2019 Compass from Defendants, or by Los Angeles Dodge Jeep Ram not returning an unsold 2019 Compass to Defendants.

98.     Given Defendants' superior position with regard to its knowledge of the motor vehicles they manufacture, market, and distribute, both with respect to consumers and to Defendants' own authorized dealership, as well as the level of control that Defendants maintain over the sales process, marketing, and brand, Defendants were and continue to control the marketing and sale of motor vehicles, including the Vehicle, to consumers, including Plaintiff.

99.     Plaintiff is informed, believes, and thereon alleges that Defendants did not communicate information concerning the Oil Consumption Defect to their authorized dealerships, despite Defendants' knowledge of the Oil Consumption Defect and the unreasonably dangerous

-34-
**COMPLAINT FOR DAMAGES**

1    condition that it presented.  Instead, Defendants actively concealed information about the Oil

2    Consumption Defect from its authorized dealerships and from potential purchasers by omitting

3    information about the Oil Consumption Defect from marketing materials and training programs

4    offered to the sales personnel at Defendants' authorized dealerships, instead opting to further

5    conceal the truth by only issuing TSBs that merely provided band-aid repairs to mask the Oil

6    Consumption Defect.

7         100.    Defendants controlled the narrative with regard to the qualities, performance, and

8    characteristics of the Vehicle directly through Defendants' product sales and marketing programs

9    that Defendants controlled and indirectly through the marketing and training materials Defendants

10   provided to their authorized dealerships and their sales personnel which are also controlled by

11   Defendants.

12        101.    As a result, Defendants were inextricably involved in the lease transaction of the

13   Vehicle to Plaintiff. Accordingly, Defendants had and continue to have a duty to disclose the Oil

14   Consumption Defect because: (a) the defect poses an unreasonable safety hazard; (b) Defendants

15   had exclusive knowledge of the persistent issues that is not reasonably discoverable by consumers,

16   including Plaintiff; and (c) Defendants have actively concealed the defect from consumers,

17   including Plaintiff.

18                    **TOLLING OF THE STATUTE OF LIMITATIONS**

19        102.    Any applicable statute(s) of limitations has been tolled by Defendants' knowing and

20   active concealment and continued denial of the facts alleged herein. Plaintiff could not have

21   reasonably discovered the true, latent defective nature of the Oil Consumption Defect until shortly

22   before this litigation was commenced.

23        103.    Defendants were and remain under a continuing duty to disclose to Plaintiff the true

24   character, quality, and nature of the Oil Consumption Defect, that this defect is based on poor

25   manufacturing, that it cannot be fixed, that it will require continued costly repairs, that it poses a

26   safety concern, and diminishes the resale value of the Vehicle. As a result of the active

27   concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to

28   the allegations herein have been tolled.

## **FIRST CAUSE OF ACTION**

### **Breach of Implied Warranty of Merchantability under Song-Beverly Warranty Act**

### **Against all Defendants**

104.    Plaintiff realleges each and every paragraph (1-103) and incorporates them by this reference as though fully set forth herein.

105.    The distribution and sale of the Vehicle was accompanied by the Defendants' implied warranty that the Vehicle was merchantable.

106.    Furthermore, Defendants, and each of them, impliedly warranted, inter alia, that the Vehicle would pass without objection in the trade under the Agreement description; that the Vehicle was fit for the ordinary purposes for which it was intended; that the Vehicle was adequately assembled; and/or that the Vehicle conformed to the promises or affirmations of fact made to Plaintiff.

107.    As evidenced by the defects, malfunctions, misadjustments, and/or nonconformities alleged herein, the Vehicle was not merchantable because it did not have the quality that a buyer would reasonably expect, because it could not pass without objection in the trade under the Agreement description; because it was not fit for the ordinary purposes for which it was intended; because it was not adequately assembled; and/or because it did not or could not be conformed to the promises or affirmations of fact made to Plaintiff.

108.    Upon discovery of the Vehicle's nonconformities, Plaintiff took reasonable steps to notify Defendants, and each of them, within a reasonable time that the Vehicle did not have the quality that a buyer would reasonably expect and, further, justifiably revoked acceptance of the nonconforming Vehicle.

109.    Plaintiff hereby gives written notice and justifiably revokes acceptance of the nonconforming Vehicle under the Commercial Code sections 2607 and 2608. Plaintiff further demands that the Defendants cancel the sale, take back the nonconforming Vehicle, refund all the money expended, pay the difference between the value of the Vehicle as accepted and the value the Vehicle would have had if it had been as warranted, and/or pay damages under the Commercial Code sections 2711, 2714, and 2715. Defendants, and each of them, have, however, refused to

-36-

**COMPLAINT FOR DAMAGES**

1   comply.

2       110.   Plaintiff hereby gives written notice and makes demand upon Defendants for

3   replacement or restitution, pursuant to the Song-Beverly Act. Defendants, and each of them, knew

4   of their obligations under the Song-Beverly Act; however, despite Plaintiff's demand, Defendants

5   and each of them, have intentionally failed and refused to make restitution or replacement pursuant

6   to the Song-Beverly Act.

7       111.   As a result of the acts and/or omissions of the Defendants, and each of them,

8   Plaintiff has sustained damage in the amount actually paid or payable under the Agreement, plus

9   prejudgment interest thereon at the legal rate. Plaintiff will seek leave to amend this Complaint to

10  set forth the exact amount thereof when that amount is ascertained.

11      112.   As a further result of the actions of Defendants, and each of them, Plaintiff has

12  sustained incidental and consequential damages in an amount yet to be determined, plus interest

13  thereon at the legal rate. Plaintiff will seek leave to amend this Complaint to set forth the exact

14  amount of incidental damages when that amount is ascertained.

15      113.   As a further result of the actions of Defendants, and each of them, Plaintiff has

16  sustained damages equal to the difference between the value of the Vehicle as accepted and the

17  value the Vehicle would have had if it had been as warranted.

18      114.   As a direct result of the acts and/or omissions of Defendants, and each of them, and

19  in pursuing Plaintiff's claim, it was necessary for Plaintiff to retain legal counsel. Pursuant to the

20  Song-Beverly Act, Plaintiff, in addition to other remedies, is entitled to the recovery of attorneys'

21  fees based upon actual time expended and reasonably incurred, in connection with the

22  commencement and prosecution of this action.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**COMPLAINT FOR DAMAGES**

## SECOND CAUSE OF ACTION

### Breach of Express Warranty under Song-Beverly Warranty Act

### Against all Defendants

115.    Plaintiff realleges each and every paragraph (1-114) and incorporates them by this reference as though fully set forth herein.

116.    The Vehicle had defects, malfunctions, misadjustments, and/or nonconformities covered by the warranty that substantially impaired its value, use, or safety to Plaintiff.

117.    Plaintiff delivered the Vehicle to Defendants or its authorized repair facilities for repair.

118.    Defendants, and each of them, failed to service or repair the Vehicle to match the written warranty after a reasonable number of opportunities to do so.

119.    The acts and/or omissions of Defendants, and each of them, in failing to perform the proper repairs, part replacements, and/or adjustments, to conform the Vehicle to the applicable express warranties constitute a breach of the express warranties that the Defendants provided to Plaintiff, thereby breaching Defendants' obligations under the Song-Beverly Act.

120.    Defendants, and each of them, failed to perform the necessary repairs and/or service in good and workmanlike manner. The actions taken by Defendants, and each of them, were insufficient to make the Vehicle conform to the express warranties and/or proper operational characteristics of like vehicles, all in violation of Defendants' obligations under the Song-Beverly Act.

121.    Plaintiff hereby gives written notice and makes demand upon Defendants for replacement or restitution, pursuant to the Song-Beverly Act. Defendants and each of them, knowing their obligations under the Song-Beverly Act, and despite Plaintiff's demand, failed and refused to make restitution or replacement according to the mandates of the Song-Beverly Act. The failure of Defendants, and each of them, to refund the price paid and payable or to replace the Vehicle was intentional and justifies an award of a Civil Penalty in an amount not to exceed two times Plaintiff's actual damages.

122.    As a result of the acts and/or omissions of Defendants, and each of them, and

1   pursuant to the provisions of the Song-Beverly Act, Plaintiff is entitled to replacement of the
2   Vehicle or restitution of the amount actually paid or payable under the Agreement, at Plaintiff's
3   election, plus prejudgment interest thereon at the legal rate. Plaintiff will seek leave to amend this
4   Complaint to set forth the exact amount of restitution and interest, upon election, when that amount
5   has been ascertained.

6          123.    Additionally, as a result of the acts and/or omissions of Defendants, and each of
7   them, and pursuant to the Song-Beverly Act, Plaintiff has sustained and is entitled to consequential
8   and incidental damages in amounts yet to be determined, plus interest thereon at the legal rate.
9   Plaintiff will seek leave to amend this Complaint to set forth the exact amount of consequential
10  and/or incidental damages, when those amounts have been ascertained.

11         124.    As a direct result of the acts and/or omissions of Defendants, and each of them, and
12  in pursuing Plaintiff's claim, it was necessary for Plaintiff to retain legal counsel. Pursuant to the
13  Song-Beverly Act, Plaintiff, in addition to other remedies, is entitled to the recovery of attorneys'
14  fees based upon actual time expended and reasonably incurred, in connection with the
15  commencement and prosecution of this action.

16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

**COMPLAINT FOR DAMAGES**

## THIRD CAUSE OF ACTION

### Fraudulent Inducement – Concealment

### Against All Defendants

125.    Plaintiff realleges each and every paragraph (1-124) and incorporates them by this reference as though fully set forth herein.

126.    Well before Plaintiff leased the Vehicle, Defendants knew about the incessant and irremediable problems that plagued the Oil Consumption Defect and knew that the Vehicle was equipped with the Oil Consumption Defect. Defendant was under a duty to disclose the Oil Consumption Defect problems because of the nature and extent of the problem which clearly posed safety issues.

127.    Having had exclusive and superior knowledge of the Oil Consumption Defect in the Vehicle and having known that Plaintiff could not have reasonably been expected to know of the Oil Consumption Defect, and because Defendants were and are in complete control of the marketing and sales narrative through its authorized dealerships and were inextricably involved in the lease transaction of the Vehicle to Plaintiff, Defendants had a duty to disclose the Oil Consumption Defect to Plaintiff in connection with the sale of the Vehicle.

128.    Defendants intentionally concealed and refused to resolve the issues created by the Oil Consumption Defect as explained in detail in this Complaint.

129.    At the time of the lease and throughout the repair efforts, Plaintiff had no reason to doubt that Defendants or its authorized dealers were acting in good faith and being fully transparent with all pertinent information. Further, Plaintiff relied on the fact that Defendants understood the problems Plaintiff was experiencing and that they were specific to the Vehicle rather than part of a widespread inherent product defect that Plaintiff has only recently learned was omitted from the information provided at the time of lease as well as during each repair visit.

130.    Further, Defendants, and each of them, deceived Plaintiff by promising that the Vehicle would conform to the applicable warranties, when Defendants knew that the Vehicle's defect could not, in fact, be repaired.

131.   As a direct and proximate result of Defendants' misrepresentations or omissions of material facts, Plaintiff has suffered damages, including actual, consequential, and incidental damages, according to proof.

132.   Plaintiff's reliance on Defendants' representations with regard to the Vehicle was a substantial factor in causing Plaintiff's harm and, therefore, Plaintiff is entitled to rescission of the Agreement, and restitution in an amount according to proof at hearing.

133.   Defendants' intentionally omitted material information regarding the Oil Consumption Defect to drive up sales and maintain its market power, as Plaintiff would not have leased the Vehicle, or would have paid substantially less for it, had Plaintiff known the truth. Defendants' acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being, and in part to enrich itself at the expense of consumers. Defendants' acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's vehicles. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

///
///
///
///
///
///
///
///
///
///
///
///
///
///

**COMPLAINT FOR DAMAGES**

1

## **PRAYER FOR RELIEF**

2          WHEREFORE, Plaintiff prays for judgment against all Defendants, and each of them, as

3    follows:

4          A.    For replacement or restitution, at Plaintiff's election, according to proof;

5          B.    For incidental damages, according to proof;

6          C.    For consequential damages, according to proof;

7          D.    For a civil penalty as provided in the Song-Beverly Act, in an amount not to

8                exceed two times the amount of Plaintiff's actual damages;

9          E.    For actual attorney's fees, reasonably incurred;

10         F.    For costs of suit and expenses, according to proof;

11         G.    For punitive damages;

12         H.    For the difference between the value of the Vehicle as accepted and the value

13               the Vehicle would have had if it had been as warranted;

14         I.    For remedies provided in Chapters 6 and 7 of Division 2 of the Commercial

15               Code;

16         J.    For pre-judgment interest at the legal rate;

17         K.    Such other relief the Court deems appropriate.

18

19   Date:   December 28, 2021                          THE BARRY LAW FIRM

20

21                                                By: _____
                                                     DAVID N. BARRY, ESQ.
22                                                   Attorney for Plaintiff,
                                                     ROSA BARAJAS

23

24

25

26

27

28

-42-
**COMPLAINT FOR DAMAGES**

# EXHIBIT "1"

CHRYSLER CAPITAL

CALIFORNIA MOTOR VEHICLE LEASE AGREEMENT – CLOSED END



Lessor (Dealer)
LOS ANGELES CHRYSLER
DODGE JEEP RAM
S FIGUEROA ST
ANGELES CA 90007-1

### FEDERAL CONSUMER LEASING ACT DISCLOSURES

| AMOUNT DUE AT LEASE SIGNING OR DELIVERY | 2 MONTHLY OR SINGLE PAYMENT | OTHER CHARGES | TOTAL OF PAYMENTS |
|---|---|---|---|
| | A $ 600.06 | | |
| | 41 $ 600.06 | | |
| | 25th 05/25/19 | | |
| | B $ 25202.52 | | |
| $ 4000.00 | C $ N/A | E | |
| | N/A | | |

2018 Chrysler Capital Chrysler
mark of FCA US LLC and
Santander Consu
owned by CCAP A
serviced by Chrys

Lessee Initials: _____ / Co-Lessee Initials: **N/A**

**8. ITEMIZATION OF AMOUNT DUE AT** ... **NING OR DELIVERY**

... N/A
... AMOUNT ... ... 4,000.00
N/A
N/A
N/A
N/A

**9. YOUR MONTHLY OR SINGLE PAYMENT IS DETERMINED AS SHOWN** ...

C. ADJUSTED ...

D. RESIDUAL VALUE ...

F. DEPRECIATION AND ANY ...

EARLY TERMINATION ...
The actual charge will ...

EXCESSIVE WEAR AND USE ...

8. PURCHASE ... END OF LEASE TERM.

PURCHASE ... LEASE TERM

**10. OTHER IMPORTANT TERMS** ...
... and default ...

**11. ITEMIZATION OF GROSS** [illegible] **D CO** [illegible]

$ 2823[illegible]

1500.00
N/A
N/A

30.00
N/A
N/A
N/A
N/A
N/A

**12. OFFICIAL FEES AND** [illegible]

**13. INSURANCE**

**14. VEHICLE WARRANTIES**

[illegible] Chrysler [illegible] Chrysler Capital [illegible]
registered Trademark of FCA US LLC and licensed [illegible]
Santander Consumer USA [illegible]
Lease agreements are owned by CCAP Auto Lease [illegible]
and serviced by Chrysler Capital

Page 3 of [illegible]    Lessee Initials: _____    Co-Lessee Initials: **N/A**

LESSEE

## 15. OPTIONAL INSURANCE AND/OR ADDITIONAL PRODUCTS

| Optional Product | Charge or Premium | Coverage | Provider | Term | By Initial... | Indicate that you elect to purchase the Optional Product |
|---|---|---|---|---|---|---|
| | | | | | | ✓ |
| | N/A | N/A | N/A | N/A | | ✓ |
| | | N/A | N/A | N/A | | ✓ |
| N/A | | N/A | N/A | | N/A | ✓ |
| N/A | | | | | | ✓ |

## 16. LATE CHARGES / RETURNED INSTRUMENT CHARGE / SECURITY DEPOSIT

A. LATE CHARGES

B. RETURNED INSTRUMENT CHARGE

C. REFUNDABLE SECURITY DEPOSIT

## 17. VEHICLE USE / MAINTENANCE

A. VEHICLE USE

B. VEHICLE MAINTENANCE

C. INDEMNITY

## 18. RIGHT TO TERMINATE EARLY

A. LESSEE'S RIGHT TO TERMINATE

B. LESSOR'S RIGHT TO TERMINATE

**19. EARLY TERMINATION LIABILITY**

A. MONTHLY LEASE

**20. ADJUSTED LEASE BALANCE**

A. MONTHLY PAYMENT LEASE

C. SINGLE PAYMENT LEASE

**21.**

C. INDEPENDENT APPRAISAL

**22. SCHEDULED TERMINATION LIABILITY / EXCESSIVE WEAR**

A. SCHEDULED TERMINATION LIABILITY

B. EXCESSIVE WEAR

**23. PURCHASE OPTION**

A. END OF LEASE TERM.

B. PRIOR TO END OF LEASE TERM.

© 2016 Chrysler Capital. Chrysler Capital is a registered trademark of FCA US LLC and licensed to Santander Consumer USA Inc. Lease agreements are owned by CCAP Auto Lease Ltd and serviced by Chrysler Capital

Lessee Initials:        Co-Lessee Initials: **N/A**

LESSEE

**A. VEHICLE RETURN/HOLDOVER**

**25. TOTAL LOSS / WAIVER OF GAP AMOUNT**

**26. DEFAULT**

**27. ARBITRATION**

Lessee Initials _____   Co-Lessee Initials: **N/A**

LESSEE

## 28. GENERAL PROVISIONS

A. SECURITY INTEREST-SET OFF

Santander Consumer USA are
Lease agreements are owned by CCAP Auto Lease Ltd.
and serviced by Chrysler Capital

**38. NOTICES**

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**12/28/2021**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ D. Williams _____ Deputy |
| NOTICE OF CASE ASSIGNMENT<br><br>UNLIMITED CIVIL CASE | |
| Your case is assigned for all purposes to the judicial officer indicated below. | CASE NUMBER:<br>21STCV47305 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✓ | Teresa A. Beaudet | 50 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record          Sherri R. Carter, Executive Officer / Clerk of Court

on 12/29/2021
        (Date)                                                                            By D. Williams _____, Deputy Clerk

LACIV 190 (Rev 6/18)            **NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**
LASC Approved 05/06

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

2019-GEN-014-00

**FILED**
Superior Court of California
County of Los Angeles

**MAY 03 2019**

Sherri R. Carter, Executive Officer/Clerk

By _____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE LOS ANGELES SUPERIOR COURT )    FIRST AMENDED GENERAL ORDER
— MANDATORY ELECTRONIC FILING   )
FOR CIVIL                        )
                                 )
                                 )
                                 )

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

   a) **"Bookmark"**   A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

   b) **"Efiling Portal"**   The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

   c) **"Electronic Envelope"**   A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

   d) **"Electronic Filing"**   Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

2019-GEN-014-00

e) **"Electronic Filing Service Provider"**  An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"**  For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"**  An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"**  A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

2019-GEN-014-00

d) Documents in Related Cases

   Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) EXEMPT LITIGANTS

   a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

   b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) EXEMPT FILINGS

   a) The following documents shall not be filed electronically:

      i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

      ii) Bonds/Undertaking documents;

      iii) Trial and Evidentiary Hearing Exhibits

      iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

      v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

   b) Lodgments

      Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

   //

   //

3

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

2019-GEN-014-00

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

   a) Electronic documents must be electronically filed in PDF, text searchable format when technologically feasible without impairment of the document's image.

   b) The table of contents for any filing must be bookmarked.

   c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4). Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

   d) Attachments to primary documents must be bookmarked. Examples include, but are not limited to, the following:

      i) Depositions;

      ii) Declarations;

      iii) Exhibits (including exhibits to declarations);

      iv) Transcripts (including excerpts within transcripts);

      v) Points and Authorities;

      vi) Citations; and

      vii) Supporting Briefs.

   e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

   f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a separate digital PDF document.

   g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

2019-GEN-014-00

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

   i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted. (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

   ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day <u>before</u> the ex parte hearing.

2019-GEN-014-00

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing. A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled. If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

    i)    Any printed document required pursuant to a Standing or General Order;

    ii)    Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

    iii)    Pleadings and motions that include points and authorities;

    iv)    Demurrers;

    v)    Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

    vi)    Motions for Summary Judgment/Adjudication; and

    vii)    Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents. Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver. (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

6

2019-GEN-014-00

1   1) SIGNATURES ON ELECTRONIC FILING

2       For purposes of this General Order, all electronic filings must be in compliance with California

3   Rules of Court, rule 2.257.  This General Order applies to documents filed within the Civil

4   Division of the Los Angeles County Superior Court.

5

6       This First Amended General Order supersedes any previous order related to electronic filing,

7   and is effective immediately, and is to remain in effect until otherwise ordered by the Civil

8   Supervising Judge and/or Presiding Judge.

9

10  DATED:  May 3, 2019                                       Kevin C. Brazile

11                                                          KEVIN C. BRAZILE
                                                          Presiding Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

           discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

    h.   Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

    i.   Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lacourt.org* under "*Civil*" and then under "*General Information*").

2.    The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
             (INSERT DATE)                    (INSERT DATE)
    complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3.    The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4.    References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____    ➤  _____
         (TYPE OR PRINT NAME)                   (ATTORNEY FOR PLAINTIFF)
Date:

_____    ➤  _____
         (TYPE OR PRINT NAME)                  (ATTORNEY FOR DEFENDANT)
Date:

_____    ➤  _____
         (TYPE OR PRINT NAME)                  (ATTORNEY FOR DEFENDANT)
Date:

_____    ➤  _____
         (TYPE OR PRINT NAME)                  (ATTORNEY FOR DEFENDANT)
Date:

_____    ➤  _____
         (TYPE OR PRINT NAME)             (ATTORNEY FOR _____)
Date:

_____    ➤  _____
         (TYPE OR PRINT NAME)             (ATTORNEY FOR _____)
Date:

_____    ➤  _____
         (TYPE OR PRINT NAME)             (ATTORNEY FOR _____)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – DISCOVERY RESOLUTION | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

    a. The party requesting the Informal Discovery Conference will:

        i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

        ii. Include a brief summary of the dispute and specify the relief requested; and

        iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

    b. Any Answer to a Request for Informal Discovery Conference must:

        i. Also be filed on the approved form (copy attached);

        ii. Include a brief summary of why the requested relief should be denied;

LACIV 036 (new)
LASC Approved 04/11
For Optional Use

**STIPULATION – DISCOVERY RESOLUTION**

Page 1 of 3

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

   iii. Be filed within two (2) court days of receipt of the Request; and

   iv. Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

 c. No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

 d. If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

 e. If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4. If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5. The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

  It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6. Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7. Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

LACIV 036 (new)
LASC Approved 04/11
For Optional Use
   **STIPULATION – DISCOVERY RESOLUTION**
   Page 2 of 3

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR PLAINTIFF)

➤ _____
(ATTORNEY FOR DEFENDANT)

➤ _____
(ATTORNEY FOR DEFENDANT)

➤ _____
(ATTORNEY FOR DEFENDANT)

➤ _____
(ATTORNEY FOR _____ )

➤ _____
(ATTORNEY FOR _____ )

➤ _____
(ATTORNEY FOR _____ )

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:           FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:
   - ☐ Request for Informal Discovery Conference
   - ☐ Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (Insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (Insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, briefly describe the nature of the discovery dispute, including the facts and legal arguments at issue.  For an Answer to Request for Informal Discovery Conference, briefly describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:     FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

**The following parties stipulate:**

Date:

> _____
(TYPE OR PRINT NAME)

> _____
(ATTORNEY FOR PLAINTIFF)

Date:

> _____
(TYPE OR PRINT NAME)

> _____
(ATTORNEY FOR DEFENDANT)

Date:

> _____
(TYPE OR PRINT NAME)

> _____
(ATTORNEY FOR DEFENDANT)

Date:

> _____
(TYPE OR PRINT NAME)

> _____
(ATTORNEY FOR DEFENDANT)

Date:

> _____
(TYPE OR PRINT NAME)

> _____
(ATTORNEY FOR _____)

Date:

> _____
(TYPE OR PRINT NAME)

> _____
(ATTORNEY FOR _____)

Date:

> _____
(TYPE OR PRINT NAME)

> _____
(ATTORNEY FOR _____)

**THE COURT SO ORDERS.**

Date: _____

_____
JUDICIAL OFFICER

# FILED

LOS ANGELES SUPERIOR COURT

MAY 1 1 2011

JOHN A. CLARKE, CLERK

*N. Navarro*

BY NANCY NAVARRO, DEPUTY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| General Order Re<br>Use of Voluntary Efficient Litigation<br>Stipulations | )<br>)<br>)<br>)<br>) | ORDER PURSUANT TO CCP 1054(a),<br>EXTENDING TIME TO RESPOND BY<br>30 DAYS WHEN PARTIES AGREE<br>TO EARLY ORGANIZATIONAL<br>MEETING STIPULATION |

Whereas the Los Angeles Superior Court and the Executive Committee of the

Litigation Section of the Los Angeles County Bar Association have cooperated in

drafting "Voluntary Efficient Litigation Stipulations" and in proposing the stipulations for

use in general jurisdiction civil litigation in Los Angeles County;

Whereas the Los Angeles County Bar Association Litigation Section; the Los

Angeles County Bar Association Labor and Employment Law Section; the Consumer

Attorneys Association of Los Angeles; the Association of Southern California Defense

Counsel; the Association of Business Trial Lawyers of Los Angeles; and the California

Employment Lawyers Association all "endorse the goal of promoting efficiency in

litigation, and ask that counsel consider using these stipulations as a voluntary way to

promote communications and procedures among counsel and with the court to fairly

resolve issues in their cases;"

-1-

ORDER PURSUANT TO CCP 1054(a)

Whereas the Early Organizational Meeting Stipulation is intended to encourage cooperation among the parties at an early stage in litigation in order to achieve litigation efficiencies;

Whereas it is intended that use of the Early Organizational Meeting Stipulation will promote economic case resolution and judicial efficiency;

Whereas, in order to promote a meaningful discussion of pleading issues at the Early Organizational Meeting and potentially to reduce the need for motions to challenge the pleadings, it is necessary to allow additional time to conduct the Early Organizational Meeting before the time to respond to a complaint or cross complaint has expired;

Whereas Code of Civil Procedure section 1054(a) allows a judge of the court in which an action is pending to extend for not more than 30 days the time to respond to a pleading "upon good cause shown";

Now, therefore, this Court hereby finds that there is good cause to extend for 30 days the time to respond to a complaint or to a cross complaint in any action in which the parties have entered into the Early Organizational Meeting Stipulation.  This finding of good cause is based on the anticipated judicial efficiency and benefits of economic case resolution that the Early Organizational Meeting Stipulation is intended to promote.

IT IS HEREBY ORDERED that, in any case in which the parties have entered into an Early Organizational Meeting Stipulation, the time for a defending party to respond to a complaint or cross complaint shall be extended by the 30 days permitted

-2-

ORDER PURSUANT TO CCP 1054(a)

by Code of Civil Procedure section 1054(a) without further need of a specific court

order.

DATED: _May 11, 2011_

Carolyn B. Kuhl, Supervising Judge of the
Civil Departments, Los Angeles Superior Court

-3-

ORDER PURSUANT TO CCP 1054(a)

 **Superior Court of California, County of Los Angeles**

---

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

**What is ADR?**
ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

**Advantages of ADR**
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control (with the parties):** Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

**Disadvantages of ADR**
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

**Main Types of ADR**
1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

**How to Arrange Mediation in Los Angeles County**

Mediation for civil cases is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
   If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

   - **ADR Services, Inc.** Case Manager Elizabeth Sanchez, elizabeth@adrservices.com (949) 863-9800
   - **JAMS, Inc.** Assistant Manager Reggie Joseph, RJoseph@jamsadr.com (310) 309-6209
   - **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

These organizations cannot accept every case and they may decline cases at their discretion. They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate or small claims cases.

b. **Los Angeles County Dispute Resolution Programs**
   https://hrc.lacounty.gov/wp-content/uploads/2020/05/DRP-Fact-Sheet-23October19-Current-as-of-October-2019-1.pdf

   Day of trial mediation programs have been paused until further notice.

   **Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

**3. Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

**4. Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/C10047.aspx

Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/C10109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm